**UNITED STATES et al. v. BROOKFIELD FISHERIES, Inc., et al.**

No. 9276.

District Court, D. Oregon.

Aug. 23, 1938.

George Neuner, U. S. Atty., J. W. McCulloch, Asst. U. S. Atty., Carl C. Donaugh, U. S. Atty., and Mason Dillard and M. B. Strayer, Asst. U. S. Attys., all of Portland, Or., for plaintiffs.

Wood, Montague, Matthiessen & Rankin, of Portland, Or., for defendants.

JAMES ALGER FEE, District Judge.

This suit by the United States as guardian of the Yakima nation and other Indian tribes, and of the individual Indian plaintiffs has been brought to restrain the defendants from prohibiting access by the Indians to a small strip of ground between the ship canal and Celilo Falls upon the southern bank of the Columbia River, and specifically from taking fish there in common with other citizens.

Here the river passes over a reef of basaltic rock in several streams, between which are rocky islands from which the Indians have fished from time immemorial. Upon this property and between the uplands and the stream exists a saddlelike depression, and in former times, between this lower level and the falls, the rock rose some forty feet into a gigantic basaltic pillar, an outstanding landmark, striking in character and unforgotten by those who have seen it, which was called "Hasslo" by the tribesmen.

Across this small strip of land and through the depression noted above runs at present a channel, at the upper end of which defendants have erected a fishwheel. Through the main river and this tiny stream, in proper season, rush the finny tribes of Chinook salmon in vast numbers, seeking the upper tributaries in which to spawn. The legal title in fee to this property passed from the United States to the State of Oregon, which conveyed it to Anne M. Lang. The latter deeded it to McLeod and Taffe in 1883, and thence the property passed by mean conveyance to the corporate defendant. There were no improvements or changes in the property until Taffe and McLeod occupied it in 1883, but from that time on, fishing in the small stream now flowing across the property became a great industry, and ever since that date the Indians have been excluded therefrom. The United States claims for its wards the right of fishing on these premises by virtue of the treaties by which the red man's right to the whole territory was extinguished and which are paramount to the title of defendants. A short, historical digression is necessary in order that the basis of this claim may be understood.

Commencing in 1855, the United States by its treaties with the Yakima nation (June 9, 1855, 12 Stat. 951), with the confederated bands of the Umatillas, Cayuses, and Walla Wallas (June 9, 1855, 12 Stat. 945), with the tribes of middle Oregon (June 25, 1855, 12 Stat. 963), and the Nez Perce and other Indians extinguished the aboriginal title to an empire, consisting of a large part of eastern Oregon, eastern Washington and Idaho. These cessions included the gorge of the Columbia and the immediate fishing places at Celilo and below. Each of the treaties above mentioned contained phrases granting the right to the Indians to take fish exclusively in the Reservations and "at all usual and accustomed places, in common with citizens of the Territory", or variably "at all other usual and accustomed stations in common with citizens of the United States".

These treaties have been interpreted in the sense in which they might have been understood by the red men. These extended to them the right to fish where they had always fished. An easement was laid down of ingress to and egress from such usual and accustomed places. A fishery in gross was attached to all real property and titles subject to that description. The government was at that time, moreover, the sovereign and proprietor, and grants made then attached to all future conveyances as if written therein. This easement inhered in the title of the Brookfield Fisheries to the land over which the small stream in question now courses if it has been shown that there was a usual and accustomed place for the Indians to fish. All this is rendered sufficiently clear by a series of decisions of the federal courts.

Now, it is incontrovertibly established that Celilo Falls and the neighborhood, generally, was a famous fishing place for the tribesmen, and it might seem sufficient for the United States to prove that the Indians fished from the islands in the river and from the rock "Hasslo," which was clearly established. These earlier cases above referred to, however, have required evidence limited rather strictly as to location, and therefore, it was held in this case incumbent upon the government to prove that the Indians usually and customarily, prior to 1855, fished in waters flowing between Hasslo and the upland.

A view of the essential facts requisite to establish the case of the United States and its wards is clouded by the mists of years and the fallibility of human memory, since more than the span of life vouchsafed by the Psalmist has expired since that treaty. To add to the difficulties, it is clearly established that in the years since the making of the treaty the topography of this

small bit of land has been entirely changed by the operations of the white man. The Celilo Canal has been driven through the solid rock between the upland and the rock "Hasslo" and just beyond the depression heretofore mentioned. Upon the upland slope of the rock reef as it arises from the depression, but between the river and the ship canal, an intake for a channel has been cut in the solid rock, and into this opening has been placed a water wheel, so constructed as to enable it to lift the fish from the stream and deposit them in containers above. Alongside this wheel a fish house has been built. From the wheel across the property to the point where the waters pour out in the main stream of the Columbia below the falls, over a steep runway, extends a fish way with regular walls cut in the rock, evidencing the plan and execution of the artificer. At the intake a wing dam has been constructed, which reaches out for considerable distances in the main stream above the falls, and which has the effect of throwing a current thereof toward that fishwheel rather than allowing it to strike at a low spot which originally existed about midway of the depression between Hasslo and the mainland. This monumental pillar has itself become converted by blasting into a flat mound. Its fragments have been piled in a series of wooden cribs which rise some fifteen feet above their base, and which fill the entire space between Hasslo and the fish wheel along the river bank, and thus completely cover the natural low point of the saddle. In order to form these cribs, the rock reef was leveled to a certain degree by blasting, and a cement dam was placed in the lowest point. The visible portions of this cement can be seen upon the river side, under the rock filled cribs and slightly above extreme low water mark.

If the Indian testimony can be given any weight, the case is conclusively established by the plaintiff. Eye witnesses of great age testify that this natural channel always existed as it does today, and that the tribesmen fished there in the years before the treaty was signed. With a wealth of intimate detail which bears circumstantial guarantee of truth, they relate how and where the villages were constructed on the upland near this spot, and how the fish were caught in this "wiep" or natural channel with spear, dip net and willow weir. Some have fished therein themselves, others have watched their kinfolk catch the Chinook, and the women have dried the fish so caught, upon the banks. However, this evidence is subject to serious criticism. Indian testimony has characteristic defects. The court, based upon considerable experience, realizes its emotional content, its acceptance as fact of oral and undisclosed tradition, its utter futility when faced with the measurement of time and distance. Moreover, glaring errors occur. Every Indian who testified on the subject said that water flows at all times over the fall between Hasslo and "Maman Chinook", the small island just beyond, and that the water flowed through its present channel on the rock always and at all seasons. Furthermore, some of the red men were incontrovertibly impeached, and one of the interpreters admitted mistranslation when questioned by the court. It must, of course, be remembered that these witnesses are members of a moribund and conquered race, mindful of ancient wrongs, and tempted to secure by guile from the overmastering force of the white man a portion of their ancient heritage.

The testimony of the white men who saw this spot upon the river bank before 1882 is of little weight. It is almost entirely negative in character, and is related to a subject in which these witnesses had no interest whatsoever. Their observation of the matters to which their testimony relates before that date was casual. Undoubtedly, also their recollection is likewise clouded by the years. Nor is some of this testimony entirely free from the prejudice of the pioneer for the Indian and his ways, nor from bias in favor of the white man who built up an industry in the wilderness, and whom nearly all knew personally.

The gist of this evidence is that the stream now flowing across the rock did not at that date exist, at least in its present channel, and that they never saw the Indians fishing on the locality in question. It is inherent in the testimony of each of these witnesses that the water did flow through the depression at certain stages of the river.

In weighing the testimony of both white and red witnesses, consideration must be given to the fact that for fifty years the Indians have been excluded by force and violence from this corner of land. The memories of the latter have reverted with a sense of injustice, to the period before the white men despoiled them, for incontrovertibly they should have been permitted to fish in the main river from "Hasslo."

The minds of the white men, on the other hand, took especial note of the blasting, building and other operations of Taffe, and in general observed the Indians during a half century fish only on the islands of the river.

It is more than probable, also, that at the only portions of the year when the Indians customarily came to this rock, the river flowed through the depression. Those whites who took particular notice of it may have seen the locality only at low water. A reconciliation of at least some of the testimony may be discovered upon a consideration of such factors.

So far as possible, however, the situation existing on this ground prior to 1882 should be reconstructed from admitted facts, coupled with other evidence which bears circumstantial guarantee of exactness.

A depression existed from time immemorial between Hasslo and the upland. At high water the river ran through this depression. At low stage the water did not flow either between Hasslo and the mainland, nor between the rock and "Lady Chinook", the first island beyond, although it still ran over the fall between "Lady Chinook" and "Auchinauches", the second island toward the Washington shore. The Columbia River, therefore, by flowing over this level reef of basalt had worn its way to some slight degree through the softer portions, leaving the harder standing above, as the islands and "Hasslo". But the depression in controversy was an integral part of this process, and without doubt had been worn out by the river itself.

The Chinook salmon when the run is on will go up river by any possible route, but will tend to avoid the weight of water in the main fall, and turn toward the fall between Hasslo and "Lady Chinook", or any water which was coming down behind Hasslo. The contention of defendants that water came over the depression at only a high stage is not borne out, but if it were, the Indians fished at any time or place that the fish ran, even in flood water.

The testimony which carries the greatest weight, however, is that which describes the fish wheel placed by Taffe as the first ever known upon the Columbia River. It is most significant that this wheel was not placed in the present channel, the intake of which has unquestionably been blasted out of solid rock, but at the exact spot on the saddle where all agree that the lowest point was. This is the spot which is now sealed with cement, and upon which the rock cribs, weighing many tons, rest. This place, under the conditions, cannot be inspected, but the evidence points to the fact that it was low enough so that the water flowed through at all times except extreme low of the river. The deduction which the court makes from the evidence is that the water would flow through here at least as low as 90 feet above sea level. At this point unquestionably existed a pot hole or crack in the basaltic rock, common enough in the geological formation lining the Columbia River. Such a phenomenon exists also upon the Washington side of the river, and the Indians fished there with a willow weir just as the Indians claim they have fished at the point here in controversy from time immemorial.

An analysis of the record shows that the locus in quo was a fishing place before Taffe came. Miss Anne Lang has lived at The Dalles and was the original purchaser of the property from the state. She testified there were no improvements upon the property at the time; that she purchased this land upon the counsel of her father to the effect that this land was an excellent fishing place. It is true she testified that this channel was not upon the rock at the time. She described the channel when no fish wheel had been built, and testified that white men and Indians had enclosed the upper end by a gate and took three tons of fish in ten minutes.

The deduction from this testimony is that a crack existed in the basalt here through which the water flowed during fishing season and that this circumstance prompted Anne Lang's father to advise her to purchase it as a good fishing place. McLeod and Taffe saw the future commercial advantages of the locality and purchased it from her.

It is highly probable that the suggestion of a fish wheel occurred to Taffe because of the existence of this narrow crack through which the water poured, and through which the Chinooks sought the upper river.

There is circumstantial evidence that there was need for a change in the intake in order to effectuate a more efficient operation. Before the wing dam was built, the heavy force of the river in flood probably struck at the point where the cribs are now built. By controlling the amount of water which entered the channel, Taffe

was able to extend the limits of the fishing season. Subsequently, since the flow of water could be better controlled by having a gate at the narrow walls of rock, he moved over closer to the mainland, cut the narrow channel which now exists, and put in the gates and the wheel, and in order to deflect more water, he built the dam. Simultaneously, he cemented up the ancient channel and built the ponderous cribs thereon. These changes placed the wheel in a place where it would not be washed out and also prevented water from coming down the old channel and deflecting the fish from the present wheel.

There is no doubt that the old channel was in part in a different place than that where it exists at the present time; likewise, the whole has been improved from the mouth up to the head. But defendants have no right just because they have changed the course of the channel, to exclude the Indians therefrom entirely. They have moved the channel over for some part of its course, but they cannot take advantage of their own wrong.

The defendants strongly urge that the doctrines of laches and estoppel should be applied to defeat recovery, since the rights of the Indians have not been urged for fifty years. Such rules have no application to the United States in their sovereign capacity. Nor should they be applied to the government in the attempt to carry out its solemn engagement with conquered and subject peoples. Only a few years before Taffe took possession of this property, the last of the Indian uprising in the Northwest was crushed. The Indians did not dare assert their rights nor resist Taffe's aggression by force. It would have been characterized as an uprising. It was many years until an enlightened policy dictated that the officials of the United States should protect these wards by legal proceedings. In justice, laches cannot be invoked against those in tutelage who had no standing to defend their own rights.

A line drawn from the lower end of the cribs straight across to the Celilo Canal will mark the exclusive property of the defendants. In the channel below that point, defendants will have the right to fish in common with the Indians hereinafter enumerated. The Indians who shall enjoy this privilege shall be the Yakima nation or Confederacy, the Umatillas, Walla Wallas, and Cayuses. The testimony is not convincing that the Nez Perce ever fished here.

Although it is not entirely logical, the defendants will be allowed the exclusive use of the intake of the channel and the structures in the vicinity, provided they permit the water to flow naturally through at all times except when necessary to protect the structures from flood.

The decree will, therefore, be so confined.