[No. 38611. En Banc. January 12, 1967.]

THE DEPARTMENT OF GAME et al., *Respondents,* v.
THE PUYALLUP TRIBE, INC., et al., *Appellants.**

*Reported in 422 P.2d 754.

*Arthur R. Knodel* and *Malcolm S. McLeod* for appellants.

*The Attorney General* and *Joseph L. Coniff, Assistant,* for respondents.

HILL, J.—The Department of Game of the State of Washington and the Department of Fisheries of the State of Washington, hereinafter called the Departments, brought

this declaratory judgment action[1] for the purpose of determining whether certain named individuals had, as members of the Puyallup Indian Tribe, any privileges or immunities from the application of state conservation measures.

The defendants asserted rights under article 3 of the Treaty of Medicine Creek (10 Stat. 1132) between the United States and various Indian tribes including the Puyallups. This treaty was signed December 26, 1854; ratified by the United States Senate March 3, 1855, and proclaimed by the President of the United States April 10, 1855. This treaty was the first of a group of 11 treaties negotiated with the Indian Tribes of the Pacific Northwest between December 26, 1854 and July 16, 1855.

By the treaty, the Puyallup Indians ceded, relinquished and conveyed to the United States "all their right, title, and interest in and to the lands and country occupied by them," in return for which they received a reservation and certain rights, including those named in article 3 which reads:

> The right of taking fish, at all usual and accustomed grounds and stations, is further secured to said Indians, in common with all citizens of the Territory,[2] and of erecting temporary houses for the purpose of curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses on open and unclaimed lands: *Provided, however,* That they shall not take shell fish from any beds staked or cultivated by citizens, and that they shall alter all stallions not intended for breeding horses, and shall keep up and confine the latter.

The trial court concluded that the Puyallup Tribe no longer existed as an entity and that its members no longer

---

[1]The case caption is erroneous, there being no entity known as "The Puyallup Tribe, Inc., a corporation." The Puyallup Tribe of Indians did appear and answer by and through the chairman of the Tribal Council.

[2]Each of the treaties with the Indians in Washington Territory preserved to the Indians the right to take fish exclusively in the reservations and at all usual and accustomed places (or, as in the treaty with which we are here concerned, "at all usual and accustomed grounds and stations"), in common with citizens of the Territory, or variably in common with citizens of the United States.

had any rights under the treaty; that there was no longer any Puyallup Indian Reservation and, hence, that the Puyallup Indians had no fishing rights within what had been the reservation; and that

It is reasonable and necessary that state conservation, rules and regulations be uniformly applied to all citizens on an equal basis. (Finding No. 4)

Consequently, the trial court permanently enjoined the defendants and all members of the "Puyallup Tribe" from fishing in the Puyallup River watershed and Commencement Bay in any manner contrary to the laws of the State of Washington, or contrary to the rules and regulations of the Departments.

From that judgment, the Puyallup Indian Tribal Council appeals.

It is first urged that the state Departments are not entitled to seek relief under the Uniform Declaratory Judgments Act (RCW 7.24.010 *et seq.*). Basically, the contention is that the issues here before us for determination should be raised in individual criminal actions brought against Indians who violate the food fish and game fish conservation laws found in Titles 75 and 77 RCW, or the regulations promulgated thereunder.

A multiplicity of arrests for violation of fishing regulations, which involve the jailing and detention for considerable periods of individuals and consequent hardship to them and their families, seems to us the unnecessarily hard way of determining whether they have immunity from certain fishing regulations.

Since the Indians who claim immunity from these regulations claim them under treaties between the United States and various Indian tribes, it seems to us that the state Departments acted wisely in seeking an interpretation of those treaties and a delineation of the rights of the members of the different tribes in a series of actions under the Uniform Declaratory Judgments Act.

On the merits, both parties assume an extreme and adamant position.

The Departments take the position that the Indians never had, as against the United States, any right to the "use and occupancy" of any land; that they were and are a conquered people without right or title to anything. Having nothing to cede, there was no consideration for any promises made to them, and there is no necessity to respect those promises even though they were labeled "treaties."

■ Our answer[3] is that regardless of whether treaties with Indian tribes were necessary, they were deemed desirable by the United States and those entered into by it cannot be repudiated by this state or its courts.

The case of *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 273, 99 L. Ed. 314, 317, 75 Sup. Ct. 313, 314 (1955), on which the Departments rely, points out specifically that there were no treaty rights involved and says:

> This is not a case that is connected with any phase of the policy of the Congress, continued throughout our history, to extinguish Indian title through negotiation rather than by force . . . .

Nor is there anything in *Village of Kake v. Egan*, 369 U.S. 60, 72, 7 L. Ed. 2d 573, 581, 82 Sup. Ct. 562, 569 (1962), also relied upon by the Departments, which contains any suggestion that the United States is now about to allow a

---

[3]A much more detailed and completely devastating answer is given by the Supreme Court of the United States in *United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 55, 91 L. Ed. 29, 67 Sup. Ct. 167 (1946). Even the dissent in that case, while disagreeing with the view of the majority opinion as to Indian rights and title in the aboriginal lands "when there has been no prior recognition by the United States through treaty or statute of any title or legal or equitable right of the Indians in the land," does not suggest the abrogation of the treaties which have been ratified.

We commend, too, as an answer to the "hard-boiled" argument of the Departments, the article on "Original Indian Title" in "The Legal Conscience," a volume of the selected papers of Felix S. Cohen (pp. 273-303), in which he points out that the *Tillamooks* case, *supra*,

". . . gives the final coup de grace to what has been called the 'menagerie' theory of Indian title, the theory that Indians are less than human and that their relation to their lands is not the human relation of ownership but rather something similar to the relation that animals bear to the areas in which they may be temporarily confined. . . ."

state to repudiate any treaty which the United States has made. The opinion does point out that,

> In 1871 the power to make treaties with Indian tribes was abolished, 16 Stat. 544, 566, 25 U.S.C. § 71.

and that there were no treaties with Alaska Indians. It should also have pointed out that the same enactment provided that "no obligation of any treaty lawfully made and ratified" with an Indian tribe prior to March 3, 1871, was "invalidated or impaired." The opinion does not directly or by inference imply that the United States was just playing "Treaty" with the Indians when the Senate ratified and the President proclaimed the treaty here in question. It was not the Indians, but the United States and the white settlers in the Territory of Washington who were asking for this and other treaties in 1854 and 1855.

The Departments further urge that if the Puyallup Indians ever had any fishing rights as such, their rights in the reservation area long ago ceased to exist; that the members of the Puyallup Tribe are all citizens of the United States and of the State of Washington and have no rights different from any other citizen.

The defendants, on the other hand, urge that they have rights under the Medicine Creek Treaty to fish on the reservation and at other "usual and accustomed grounds and stations" at any time and with any type of gear they choose and that they do not have to comply with any regulation, or if they have to recognize any regulation it must be "indispensable" to the preservation of the fishery. (This last position is posited on *Maison v. Confederated Tribes of the Umatilla Indian Reservation,* 314 F.2d 169 (9th Cir. 1963), which will be discussed later in this opinion.)

The observation of Mr. Justice Black in *Tulee v. Washington,* 315 U.S. 681, 684, 86 L. Ed. 1115, 1119, 62 Sup. Ct. 862, 864 (1941), is still apropos:

> We think the state's construction of the treaty is too narrow and the appellant's too broad;  .  .  .  .

The members of the tribes signatory to the various treaties do have certain special fishing rights thereunder, notwith-

standing the contention of the state. And the members of such tribes are subject at least to regulations which are necessary for the preservation of the fishery, notwithstanding their contentions to the contrary.

We will now consider whether the trial court erred in reaching the conclusion:

There is no presently existing Puyallup Tribe of Indians which succeeds in interest to the original Puyallup Indian Tribe which was signatory to the Treaty of Medicine Creek. (Conclusion of Law No. 1)

To support this conclusion, the trial court made findings Nos. 10 and 11.

While some of the defendants have participated in the affairs of a federally organized group known as the "Puyallup Tribe", this organization is in essence no different than the Italian-American Club or the Sons and Daughters of Norway, or like social groups. Over the years, the defendants have blended themselves into the dominant Western-European society to such an extent that they are indistinguishable from all other citizens of this state except for the fact that in some instances individuals may be able to trace their blood line ancestry to a member of the aboriginal tribe of Puyallup Indians. The activities of the defendants, insofar as they are related to the federal organization known as the "Puyallup Tribe", have been limited to considering problems with regard to membership, operation of cemetary [sic], the disposition of certain trust funds remaining on deposit for their benefit in the Treasury of the United States and the present assertion of their claimed immunities from state conservation measures.

The federal organization known as the "Puyallup Tribe" maintains no courts, has no policemen, and occupies no given land area. In fact, the lands over which the defendants assert exclusive jurisdiction now comprise an integral part of the City of Tacoma. (Finding No. 10)

In 1929 the United States Government established a membership list of the then living descendants of the aboriginal tribe of Puyallup Indians. Blood line descendancy was not required to have an individual's name appear on the roll. The 1929 roll was prepared for the purpose of distributing certain funds resulting from the sale of the few remaining trust lands still held for the

benefit of the aboriginal Puyallup Tribe of Indians by the United States Government. This roll is now out of date, and although some efforts have been made to make it current, these efforts have not yet been successful. This court is unable to determine who is, or is not, a member of the federal organization known as the "Puyallup Tribe" at this time. (Finding No. 11)

■ We are satisfied that so long as the United States government, through its appropriate agencies, continues to recognize the existence of the Puyallup Tribe of Indians and its tribal roll, as they clearly do, the Superior Court for Pierce County acted without jurisdiction in making a judicial determination of the tribe's termination.

Historically and uniformally the termination of federal supervision of an Indian tribe has been accomplished by the Congress through enactment of legislation.[4] And even the Supreme Court of the United States defers to the executive and other political departments of government "whose more special duty it is to determine such affairs" stating that "If by them those Indians are recognized as a tribe, this court must do the same." (*United States v. Sandoval*, 231 U.S. 28, 47, 58 L. Ed. 107, 114, 34 Sup. Ct. 1, 6 (1913)).

The trial court's "Memorandum Decision" is a very able and scholarly document, and while we have disagreed on this phase of the case, we are persuaded by its presentation that the time is long past when there should be a supercitizenship on the part of those proudly claiming Puyallup-tribe ancestry which entitles them to disobey laws and regulations imposed for the conservation of a great natural resource, which all other citizens must obey. However, it is a supercitizenship conferred by treaty, and only the United States can remove the discrimination.

---

[4]For examples of such legislation see: Termination of the Klamath Tribe, 25 U.S.C.A. § 564; Termination of Wyandotte Tribe of Oklahoma, 25 U.S.C.A. §§ 791-807; Termination of the Peoria Tribe of Oklahoma, 25 U.S.C.A. §§ 821-826; Termination of the Ottawa Tribe of Oklahoma, 25 U.S.C.A. §§ 841-853; Termination of Menominee Tribe of Wisconsin, 25 U.S.C.A. §§ 891-902; and Termination of the Ponca Tribe of Nebraska, 25 U.S.C.A. §§ 971-980.

The trial court also found:

All of the lands within the exterior boundaries of the old Puyallup Indian Reservation were sold, in fee simple absolute, pursuant to an act of Congress (33 Stat. 565) with the exception of two small tracts which are presently being utilized as a cemetery for members of the federal organization known as the "Puyallup Tribe." The total acreage remaining in trust status is approximately 22 acres. The original reservation was in excess of 18,000 acres. (Finding No. 12)

The evidence supports this finding, and it is clear that though the Puyallup Tribe continues to exist, the entire reservation, except for the small tract to which reference was made, has passed into fee simple private ownership, consequent to congressional action, and that there is no longer a reservation.

Some questions having arisen concerning the power of the Indian allottees to convey complete fee simple title to their allotted lands, Congress confirmed the removal of the trust restrictions against alienation of the allotted lands. 33 Stat. 565 (1904).

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act of Congress approved March third, eighteen hundred and ninety-three (Twenty-seventh Statutes, page six hundred and thirty-three), authorizing the sale of the Puyallup allotted lands, with restriction upon alienation "for a period of ten years from the date of the passage" thereof, shall be taken and construed as having expressed the consent of the United States to the removal of restriction upon alienation by said Puyallup Indians to their allotted lands from and after the expiration of said period shall be given effect of having been made without any restrictions upon the power of the allottee to alienate his land.

Conclusive evidence of congressional intent is shown by the House Committee's Report on this bill:

This bill (H.R. 5767) is designed to give the consent of Congress to the removal of the restrictions heretofore placed on the sale of Puyallup allotted lands, and to permit said allottees to lease, encumber, grant, alien, sell

254

and convey said lands as freely as any other person may sell and convey real estate. (H.R. Rep. No. 301, 58th Cong., 2d Sess. (1904))

Attached to the report, as an exhibit, was a letter from the Commissioner of Indian Affairs expressing the view that,

Should it become a law, it would certainly be clear to all concerned that the Government thereby gives its absolute, full, and complete consent to the removal of the restrictions mentioned.

There can be no question but that the legislation, as enacted, carried out the legislative intent.

Whether the land within the reservation remains in the possession of the original allottees, or whether it has passed into non-Indian hands, the result is the same, so far as the tribe is concerned: It has no legal interest in it. All of the land may be taxed by the state (except possibly the small tract reserved for cemetery purposes). *Goudy v. Meath,* 38 Wash. 126, 80 Pac. 295 (1905).

█ While reservation lands are allotted and sold pursuant to an Act of Congress removing all restrictions upon alienation, there is no implied reservation of hunting and fishing rights. *United States ex rel. Marks v. Brooks,* 32 F. Supp. 422 (1940), citing *Pennock v. Commissioners,* 103 U. S. 44, 48, 26 L. Ed. 367 (1881), and *Spalding v. Chandler,* 160 U. S. 394, 407, 40 L. Ed. 469, 16 Sup. Ct. 360 (1896).

The fishing rights of members of the Puyallup Tribe rest not upon any rights in the reservation lands, because these have been surrendered pursuant to the congressional action to which we have referred, but upon their "right of taking fish, at all usual and accustomed grounds and stations, . . . in common with all citizens of the Territory," derived from the Medicine Creek Treaty. We are well aware of the statement in *United States v. Winans,* 198 U.S. 371, 49 L. Ed. 1089, 25 Sup. Ct. 662 (1905), quoted in *Seufert Bros. Co. v. United States,* 249 U. S. 194, 198, 63 L. Ed. 555, 558, 39 Sup. Ct. 203 (1919):

"We will construe a treaty with the Indians as 'that unlettered people' understood it, and 'as justice and reason demand in all cases where power is exerted by the

strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superiour justice which looks only to the substance of the right without regard to technical rules.' 119 U.S. 1; 175 U.S. 1."

█ We would protect these treaty rights as readily and effectively as they have been protected in *Winans, supra, Seufert Bros. Co., supra,* and *United States v. Brookfield Fisheries,* 24 F. Supp. 712 (D.C. Ore. 1938), but such rights are not absolute; they do not extend to the right to fish with such gear and at such times as would destroy the fishery. The United States Supreme Court, in *Tulee v. Washington, supra,* said:

[T]he treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here. (Footnote omitted.) (p. 684)

Consistent with this statement by the Supreme Court, this court and the Ninth Circuit Court of Appeals have passed on the regulations imposed by the Departments with an eye to determining whether the regulations concerning the manner and time of fishing then in question were necessary to the conservation of the fishery and, hence, could be enforced against Indians whose rights to fish at their usual and accustomed grounds and stations were preserved to them by treaties similar to the one before the court in the *Tulee* case.

*McCauley v. Makah Indian Tribe,* 128 F.2d 867, 870 (9th Cir. 1942), was tried in the district court before the decision in *Tulee* was handed down, but heard in the circuit court following that decision. The district court had entered a sweeping injunction against the enforcement of regulations interfering with the Makah Indians fishing in the Hoko River. The case was reversed with the closing comment.

The case seems to have been tried by both parties on the theory that the Indians had either all fishing rights on the Hoko River or only those of non-Indian citizens. It

well may be that the Tulee case has decided all that the parties are seeking to determine regarding the Makah treaty provision. However, in reversing it is with permission to the appellees to amend their complaint and present the issue of their right to such claimed allowable methods of fishing, specifically described, and not by such a general term as "other Indian fishing gear," as they may be advised.

In *Makah Indian Tribe v. Schoettler*, 192 F.2d 224, 226 (9th Cir. 1951), again the Makah Indians sought an injunction against enforcement of certain regulations, and the district court dismissed the action; the Makahs appealed. The circuit court—citing the *Tulee* case, *supra,* and *Seufert Bros. Co. v. United States, supra,* and *United States v. Winans, supra*—summarily disposed of the contention which is also made here by the Departments, that the Indians had no rights against state interference which do not exist for other citizens. It quoted with approval *Tulee, supra,* concerning such restrictions of a purely regulatory nature relative to the time and manner of fishing outside the reservation as are necessary for the conservation of fish and then said:

> We are not here concerned, as we were in McCauley v. Makah Indian tribe, 9 Cir., 128 F.2d 867, with any particular form of regulation. We do not question the right to enact regulations which will permit fishing in the Hoko River to the extent that will give the Makahs their treaty right to fish there without depletion of the fall run of salmon. We hold no more than that the appellee has not sustained its burden of proof that the instant regulations preventing the Makahs from the taking of fish in the Hoko are "necessary for the conservation of fish" in the fall run of salmon in that river.
>
> The decision of the district court is reversed and that court ordered to make and enter an order restraining the appellee from enforcing such regulations.

In *State v. McCoy*, 63 Wn.2d 421, 387 P.2d 942 (1963), we upheld a 10-day closure of all fishing on the Skagit River, designed to protect the peak of the salmon run passing

through that river to the spawning grounds,[5] on the basis that the regulation was necessary to conserve chinook salmon runs in the Skagit River. In that case, McCoy, a member of the Swinomish Tribe, was arrested for fishing near the mouth of the north fork of the Skagit River. He was operating an 18-foot, 25-hp-outboard-motor boat and using a 600-foot modern nylon gill net. The superior court found that he was not fishing on the reservation, but was fishing at "usual and accustomed grounds" and acquitted him, holding that his rights under the Treaty of Point Elliott (12 Stat. 927; January 22, 1855) gave him immunity to closure regulations. We reversed the judgment and sent the case back for a new trial, directing that the court determine whether the regulation violated was necessary to conserve the fishery.

We agree with the trial court that the rule of the *McCoy* case, *supra,* is the proper one to be applied where treaty rights and state conservation regulations are in apparent conflict. The burden of proof, once the defendant has established that he is a member of a tribe having a treaty right to take fish at all "usual and accustomed grounds and stations," is on the state to show that its regulations, which limit Indian fishing rights either as to the time or manner of fishing, are reasonable and necessary to conserve the fishery.

■ The United States did not hesitate to adopt regulations it regarded as necessary to preserve the halibut fishery. The Makah Tribe sued to recover damages for alleged deprivation of the fishing rights reserved to them under article 4 of their 1855 treaty (12 Stat. 1939) with the United States. The Court of Claims held that the government's regulations restricting the rights of the Makahs to fish for halibut did not amount to a breach of the treaty. *Makah Indian Tribe v. United States,* 7 Ind. Cl. Comm. 477

---

[5]For a better understanding of the necessity of conservation regulations to conserve the salmon runs, see the opinion in the *McCoy* case, *supra,* and Judge Finley's concurring opinion in *State v. Satiacum,* 50 Wn.2d 513, 535 *et seq.,* 314 P.2d 400 *et seq.* (1957).

(1959); affirmed 151 Ct. Cl. Rep. 701 (1960); *cert. denied* 365 U. S. 879, 6 L. Ed. 2d 191, 81 Sup. Ct. 1028 (1961).

The appellants have seized upon certain language in the recent case of *Maison v. Confederated Tribes of the Umatilla Indian Reservation, supra,* as establishing the rule that the particular regulation sought to be imposed by the state must be shown to be "indispensable" to the preservation and protection of the fishery sought to be regulated before it can be enforced against Indians claiming treaty rights to fish at "usual and accustomed grounds and stations."

The word "indispensable" is taken from *Tulee v. Washington, supra,* where the Supreme Court of the United States struck down a requirement for a fishing license as applied to treaty Indians.

Viewing the treaty in this light, we are of the opinion that the state is without power to charge the Yakimas a fee for fishing. A stated purpose of the licensing act was to provide for "the support of the state government and its existing public institutions." Laws of Washington (1937) 529, 534. The license fees prescribed are regulatory as well as revenue producing. But it is clear that their regulatory purpose could be accomplished otherwise, that the imposition of license fees is not *indispensable to the effectiveness of a state conservation program.* Even though this method may be both convenient and, in its general impact, fair, it acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve. We believe that such exaction of fees as a prerequisite to the enjoyment of fishing in the "usual and accustomed places" cannot be reconciled with a fair construction of the treaty. (Italics ours)

It was the exaction of a fee for fishing which could not be reconciled with a fair construction of the treaty.

All would agree that the imposition of license fees is not indispensable to the effectiveness of a state conservation program, but such a holding is not supporting authority for the proposition that any regulation that the state adopts must be indispensable to the success of its conservation program before that regulation is applicable to treaty Indians. We are convinced that the Supreme Court did not

set up such an impossible standard in *Tulee,* nor did it intend to. The real holding in that case is

> [T]hat, while the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here. (Footnote omitted.) (p. 684)

*Tulee* and other Supreme Court decisions recognize that the state must have the necessary power of appropriate regulation to preserve a resource for the benefit of all of the people of the state. *New York ex rel. Kennedy v. Becker,* 241 U.S. 556, 60 L. Ed. 1166, 36 Sup. Ct. 705 (1916); *United States v. Winans, supra.*

We are convinced that the three judges of the 9th Circuit Court of Appeals, who decided the *Maison* case, *supra,* read too much into the Supreme Court's use of the word "indispensable" in the *Tulee* case and have created therefrom a completely unworkable standard for determining what regulations relative to the time and manner of fishing outside the reservation may be imposed on Indians claiming treaty rights.

It would make the competent exercise of the state's inherent power of preservation an impossibility. In *New York ex rel. Kennedy v. Becker, supra,* the United States Supreme Court discussed the reserved rights of the Seneca Indians to fish in the waters on land ceded by them to Robert Morris by the treaty of the "Big Tree" of September 15, 1797[6] (7 Stat. 601). Mr. Justice Hughes, in an opinion adopted by the court after his resignation in 1916, said:

> It is said that the State would regulate the whites and that the Indian tribe would regulate its members, but if neither could exercise authority with respect to the other at the *locus in quo,* either would be free to destroy the subject of the power. Such a duality of sovereignty instead of maintaining in each the essential power of preservation would in fact deny it to both.

---

[6]Ratified by the Senate on April 11, 1798, and proclaimed by the President.

It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing to which the legislation in question was addressed. Adopted when game was plentiful—when the cultivation contemplated by the whites was not expected to interfere with its abundance—it can hardly be supposed that the thought of the Indians was concerned with the necessary exercise of inherent power under modern conditions for the preservation of wild life. But the existence of the sovereignty of the State was well understood, and this conception involved all that was necessarily implied in that sovereignty, whether fully appreciated or not. We do not think that it is a proper construction of the reservation in the conveyance to regard it as an attempt either to reserve sovereign prerogative or so to divide the inherent power of preservation as to make its competent exercise impossible. Rather are we of the opinion that the clause is fully satisfied by considering it a reservation of a privilege of fishing and hunting upon the granted lands in common with the grantees, and others to whom the privilege might be extended, but subject nevertheless to that necessary power of appropriate regulation, as to all those privileged, which inhered in the sovereignty of the State over the lands where the privilege was exercised. This was clearly recognized in *United States v. Winans*, 198 U.S. 371, 384, where the court in sustaining the fishing rights of the Indians on the Columbia River, under the provisions of the treaty between the United States and the Yakima Indians, ratified in 1859, said (referring to the authority of the State of Washington): "Nor does it" (that is, the right of 'taking fish at all usual and accustomed places') "restrain the State unreasonably, if at all, in the regulation of the right. It only fixes in the land such easements as enable the right to be exercised." (pp. 563, 564)

Attention is particularly directed to the quotation from *United States v. Winans, supra,* at the end of the foregoing quotation.

*In summary*: We have rejected the Departments' argument that the Indian treaties are of no force and effect and that the state may repudiate them at will.

We have ruled that the trial court had no jurisdiction to determine whether or not there had been a termination of the Puyallup Indian Tribe, and that the tribe continues to exist, at least so long as it is recognized as such by the appropriate agencies of the United States, or until Congress passes a termination act.

We have agreed with the trial court that there is no longer a Puyallup Indian Reservation, and that the Puyallup Indians no longer have any special or treaty rights to fish thereon because it was once a reservation; however, we hold that they continue to have a right to fish at usual and accustomed grounds and stations and that any regulations of the Departments limiting or restricting those rights must be reasonable and necessary for the preservation of the fishery.

The state has clearly met that test, at least to the extent that it has established that continued use by the defendants of their drift nets and set nets would result in the nearly complete destruction of the anadromous fish runs in the Puyallup River and that a regulation prohibiting the use of such nets was necessary for the preservation of the fishery.

We are, therefore, in accord with the conclusion of the trial court that an injunction should be entered in this case; however, the injunction entered by the trial court is much too broad. It permanently enjoins individual defendants and members of the federal organization known as the "Puyallup Tribe" from fishing in the Puyallup River watershed and Commencement Bay in any manner that is contrary to the rules and regulations of the Department of Fisheries of the State of Washington and the Department of Game of the State of Washington. It is predicated on the trial court's determination that the defendants have no treaty rights.

The cause must be remanded to the trial court for the entry of a judgment and decree predicated upon the proposition that the defendants do have treaty rights, but that they are subject to conservation regulations which are reasonable and necessary to preserve the fishery.

The essence of this opinion is—and the decree, as reframed, should so reflect: (1) If a defendant proves that he is a member of the Puyallup Tribe; and (2) He is fishing at one of the usual and accustomed fishing places of that tribe; (3) He cannot be restrained or enjoined from doing so, unless he is violating a statute, or regulation of the Departments promulgated thereunder, which has been established to be reasonable and necessary for the conservation of the fishery.

The injunction should be tailored to the particular situation. A specific act or acts should be enjoined on the basis that there has been a violation of a statute or statutes, or a regulation or regulations promulgated thereunder, and that such regulation or regulations are reasonable and necessary for the preservation of the fishery. The findings, conclusions, and judgment in this case should be rewritten to show clearly the basis and the extent of the injunction.

The judgment and decree appealed from is set aside, and the cause is remanded for the purposes indicated in this opinion.

Neither the appellants nor the respondents having prevailed to the full extent of their claims, each will bear its own costs on this appeal.

FINLEY, C. J., WEAVER, and HAMILTON, JJ., and LANGENBACH, J. Pro Tem., concur.

DONWORTH, J. (concurring in part and dissenting in part)—I concur in the result reached in the majority opinion in so far as it holds that appellants in this case do have treaty rights and have standing to assert those rights in this suit, but I do not agree that the test of their right to fish is dependent on the existence or nonexistence of a state statute or regulation which has been held by the trial court to be reasonable and necessary for the conservation of fish.

I would reverse the trial court's degree of permanent injunction with directions to dismiss the action for any one or all of the three reasons stated below.

I.

I am of the opinion that:

(1) The provisions of article 3 of the Treaty of Medicine Creek are presently the supreme law of the land and are superior to the exercise of the state's police power respecting the regulation of fishing by Indians at places where the treaty is applicable.

(2) If the Secretary of the Interior and the Commissioner of Indian Affairs have adopted the proposed rules relating to off-reservation fishing by treaty Indians, the Federal Government has assumed control of the matters in controversy in this case, and state courts may not enjoin appellants from fishing in the Puyallup River. See 30 Fed. Reg. 8969.

(3) Assuming, arguendo, that the trial court had power to enjoin such fishing, the findings of fact do not support the conclusions of law or the permanent injunction entered by it. In my opinion, this statement is correct regardless of whether the "indispensable" test or the "reasonable and necessary" test be applied.

My views on the rights of treaty Indians to fish "at all usual and accustomed grounds and stations" are stated at some length in the first opinion (signed by four judges) in *State v. Satiacum,* 50 Wn.2d 513, 314 P.2d 400 (1957), and in my dissenting opinion in *State v. McCoy,* 63 Wn.2d 421, 387 P.2d 942 (1963). See the decisions of the courts of last resort quoted and discussed therein.

In the interest of brevity, I incorporate those two opinions herein by reference as a part of this opinion. In those opinions, it was stated that, under the federal constitution, the treaty was the supreme law of the land and would continue to be until:

(1) the treaty is modified or abrogated by act of Congress, or

(2) the treaty is voluntarily abandoned by the Puyallup tribe, or

(3) the supreme court of the United States reverses or modifies our decision in this case. (at 529)

In the last 9 years since the two *Satiacum* decisions were filed none of these events have taken place. Nor have respondents sought a final solution of the problem through any branch of the United States Government—legislative, executive, or the Supreme Court.

## II.

In the case at bar, the United States has for the first time appeared in this court and filed a brief as amicus curiae. Its counsel participated in the oral argument.

The United States contends in its brief that the trial court's permanent injunction fails to give *any* recognition to the rights secured to the Indians by article 3 of the Treaty of Medicine Creek. After citing cases relating to this contention, the government's brief states:

> . . . It is enough at this point to note that the permanent injunction against fishing in the instant case, except in accordance with the regulations applicable to all, absolutely ignores the treaty-reserved rights of these Indians. Conclusion of Law IV, *supra*, is plainly contrary to *Tulee*. For this reason alone, the judgment and decree must be reversed.

It is further argued therein that the scope of the treaty-reserved rights of the Indians may best be determined by a federal authority. The reasons supporting this argument are stated as follows:

> We must start with the established principle that interpretation of a treaty with an Indian tribe, like a treaty with a foreign nation, presents a federal question. *Worcester v. Georgia*, 6 Pet. 515 (1832). Had the Treaty itself, or Congress in contemporary or subsequent legislation, more specifically defined the right reserved or regulated how it was to be exercised (which would be another way of defining its scope), there would be no problem today. For, clearly, the federal statute would prevail, and no state law or regulation could impinge upon the Indians' exercise of the right as defined or regulated. See *Missouri v. Holland*, 252 U. S. 416 (1920), where the Supreme Court rejected the argument that implementing legislation pursuant to a treaty interfered with exercise of state regulatory provisions as to wildlife.

The brief then states that, pursuant to congressional action, the Secretary of the Interior and the Commissioner of Indian Affairs have proposed the adoption of certain rules relating to off-reservation treaty fishing which have been published in 30 Fed. Reg. 8969. The proposed rules were signed by the Under Secretary of the Interior on July 5, 1965. Whether they have yet been officially adopted, we are not advised.

I mention the government's amicus curiae brief at some length because this is the first indication we have had of what the government's legal or administrative position is in regard to the status of the Treaty of Medicine Creek or to a departmental solution of the problems heretofore presented to this court concerning the off-reservation fishing rights of treaty Indians.

Thus, we now have official information that the legal representatives of the government take the position that an Indian treaty is the same as a treaty with a foreign nation. I presume that this means that an Indian treaty under the Supremacy Clause of the United States Constitution is the supreme law of the land. *Cf.* first opinion in *State v. Satiacum, supra,* and cases cited therein. We are also assured that the Interior Department is proposing to take some action regarding the regulation of off-reservation fishing by treaty Indians.

### III.

I desire to point out that I disagree with the majority's discussion of the holding of the Court of Appeals in *Maison v. Confederated Tribes of Umatilla Indian Reservation,* 314 F.2d 169 (9th Cir. 1963), where that court said, at 172:

Thus, in both the Tulee and Makah cases it was held that the Indians' right to fish is qualified by the state's right to regulate such fishing when necessary for conservation. But, to establish necessity the state must prove two facts: *first,* that there is a need to limit the taking of fish, *second,* that the particular regulation sought to be imposed is "indispensable" to the accomplishment of the needed limitation.

Before discussing whether the defendants have sustained their burden of proof it will be helpful to briefly explain the life cycle of the salmon and steelhead fish. Such fish are anadromous; that is to say, they are born in fresh water streams, migrate to and live the greater part of their lives in the ocean and, just before dying, return to the place of their birth to spawn. The fish born in a particular stream are delicately adjusted to its peculiar characteristics and instinctively return to it at the time of the year when successful spawning can occur. Attempts at stocking barren streams have been costly and only sporadically successful, and severe decimation of a run of fish in a particular stream can result in the permanent destruction of its population. In traveling upstream to spawn many debilitating hardships are encountered, including natural predators, disease and water pollution. By the time they reach the spawning ground, the body oils of the fish are practically used up, and they are often cut, bruised, diseased, and afflicted with fungus growths.

Defendants contend that "conservation through wise use, the keynote of modern fisheries management," dictates that the plaintiffs' fishing on the spawning grounds be restricted because the value of the fish there is highest as seed stock but lowest as food.

After discussing certain testimony presented by the Oregon officials, the Court of Appeals concluded:

However, the treaty dealt only with the rights of the plaintiffs' ancestors, and did not secure rights to any other group or class. Therefore, while a restriction of the fishing activities of the plaintiffs must be *indispensable,* as required by the treaty [Tulee v. Washington, supra.], a restriction of the fishing activities of other citizens of a state is valid if merely *reasonable,* as required by the Fourteenth Amendment to the United States Constitution. Thomson v. Dana, 52 F.2d 759 (D. Ore. 1931), aff'd. 285 U.S. 529, 52 S.Ct. 409, 76 L.Ed. 925 (1932). The complete exclusion of sports fishermen from the spawning grounds as an alternative does not amount to arbitrary discrimination against them, because the state possesses broader power to regulate sports fishing than it does to regulate fishing by the Indians. This one of the alternatives listed by the court being available, we need not discuss the others.

The word "indispensable" is said by the majority not to be supported by the two cases cited by the Court of Appeals, to wit, *Tulee v. Washington,* 315 U. S. 681, 86 L. Ed. 1115, 62 Sup. Ct. 862, and *Makah Indian Tribe v. Schoettler,* 192 F.2d 224 (9th Cir. 1951). However, the United States Supreme Court denied the state of Oregon's petition for certiorari in the *Maison* case (375 U. S. 829, 11 L. Ed. 2d 60, 84 Sup. Ct. 73).

While the denial of certiorari is not to be considered as an expression of approval of the lower court's decision, the *Maison* case involved the interpretation of a treaty which under the Supremacy Clause of the United States Constitution is the supreme law of the land, and hence could be authoritatively interpreted only by the United States Supreme Court. If the word "indispensable," in the context in which the court of appeals used it in the *Maison* case, substantially changed the meaning of the treaty as to the state's power of regulation of Indian fishing rights, one would suppose that, in view of the many conflicting decisions of various state and federal courts on this vital subject, the Supreme Court would have granted certiorari.[7]

The *Maison* decision was followed by Judge Solomon sitting in the United States District Court for the District of Oregon in *Confederated Tribes of the Umatilla Indian Reservation v. Maison,* 262 F. Supp. 871 (decided August 8, 1966). This case involved the right of treaty Indians to hunt game. The language of the treaty involved was similar to the treaty in the case now before us. In upholding the Indians' right under the treaty to hunt game, Judge Solomon said:

> In Confederated Tribes of the Umatilla Indian Reservation v. Maison, et al., D.C. 186 F. Supp. 519, 520, I construed this article to mean that the State may not restrict the off-reservation fishing rights set forth in the treaty

[7]This is the second time that the United States Supreme Court has failed to grant a petition for certiorari which sought an authoritative ruling on the status of an Indian treaty with respect to state police power. See discussion of *State v. Arthur,* 74 Ida. 251, 261 P.2d 135 (1953), found in *State v. Satiacum,* 50 Wn.2d at pages 525-529.

without showing that such restriction was necessary for conservation of the fish. The Court of Appeals in affirming this decision laid down the test to be applied to State-imposed restrictions of treaty rights:

" * * * while a restriction of the fishing activities of the plaintiffs must be *indispensable*, * * * a restriction of the fishing activities of other citizens is valid if merely *reasonable* * * * " (9 Cir., 314 F.2d 169, 174 emphasis in original).

. . . .

In other words, defendants here contend that in spite of the provisions of the treaty, the Indians have no greater rights to fish and hunt off their reservation than any other Oregon citizen. This contention was made and rejected in United States v. Winans, 198 U. S. 371, 25 S. Ct. 662, 49 L. Ed. 1089 (1905); Tulee v. State of Washington, 315 U. S. 681, 62 S. Ct. 862, 86 L. Ed. 115 (1942); and Makah Indian Tribe v. Schoettler, 192 F.2d 224 (9th Cir. 1951).

. . . .

No one disagrees with the defendants' argument that regulation of fish and game resources is necessary and desirable, and that an intolerable situation would arise if all citizens were permitted to fish or hunt without restriction. However, the issue here is whether a State is permitted to proscribe or limit the treaty rights of Indians without showing that such restriction is indispensable. *Confederated Tribes, supra.*

Until the Supreme Court holds that the term "indispensable" is not the correct test to be used in determining the validity of state laws and regulations vis-a-vis the fishing rights of treaty Indians, I think that this court should not read the word out of the *Maison* decision and substitute "reasonable and necessary" therefor.

Even if the rule approved by the majority decision in the case at bar is followed (*i.e.* that the state has the burden of proving that its regulations are reasonable and necessary to conserve the fishery), I see no need for a further hearing.

The trial court stated in its memorandum decision that the total amount of salmon caught by Indians in the entire state in 1964 was only between 3 per cent and 5 per cent of the total number taken by Indians and non-Indians.

The trial court found the facts as to the fishing activities of appellants to be:

XIII. That the individual defendants began openly fishing the Puyallup River in 1953 contrary to the laws, rules and regulations of the State of Washington. Since that time, the defendants have gradually increased the intensity of their drift net and set net fisheries, using modern nylon monofilament nets, to the point that the anadromous fish runs of the Puyallup River are presently unable to maintain themselves in an abundant supply without supplemental plantings by the state.

XIV. The Puyallup River from Commencement Bay to its upper tributaries constitutes and is a prime spawning and rearing area for anadromous fish.

XV. The defendants have indicated that unless restrained from so doing, they will continue to fish in the Puyallup River and Commencement Bay in the manner in which their fishing activities have taken place since 1953.

XVI. That the place, time, and manner of fishing by the defendants was and is in violation of the rules, and regulations of the State of Washington. That the fishing activities of the defendants, if allowed to proceed unrestrained could result in the destruction or serious impairment of the anadromous fish runs of the Puyallup River.

XVII. That once anadromous fish runs in a river system have been destroyed, it is generally impossible to reestablish them.

XVIII. It is reasonable and necessary that state conservation, rules and regulations be uniformly applied to all citizens on an equal basis including the defendants.

The ultimate finding of fact is that the fishing activities of appellants, if not restrained, *could* result in the destruction or serious impairment of the anadromous fish runs on the Puyallup River.

The above quoted findings do not, in my opinion, support the conclusion that:

It is reasonable and necessary that state conservation, rules and regulations be uniformly applied to all citizens on an equal basis including the defendants.

Neither do they justify the entry of the trial court's judgment and decree which contained the following injunctive provision:

It is hereby Ordered, Adjudged, and Decreed That:

The individual defendants and all members of the federal organization known as the "Puyallup Tribe" are hereby permanently enjoined from fishing in the Puyallup River watershed and Commencement Bay in any manner that is contrary to the laws of the State of Washington or contrary to the rules and regulations of the Department of Fisheries of the State of Washington and the Department of Game of the State of Washington.

I agree with the following statement made in the brief of the amici curiae Association on American Indian Affairs, Inc., as to the effect of the trial court's permanent injunction quoted above wherein it is said:

The decision below concerning the purported nonexistence of the Puyallup Tribe today is novel, wholly contrary to well-established principles of Indian law, and completely at odds with sound public policy. In the first place, only Congress, and clearly not the State courts, has power to effect the termination of tribal status. *Creek County v. Seber,* 318 U.S. 705, 718 (1943); *United States v. McGowan,* 302 U. S. 535, 538 (1938); *United States v. Nice,* 241 U. S. 591, 598 (1916); *United States v. Sandoval,* 231 U. S. 28 (1913). Indeed, the rule that sole responsibility for declaring when tribal existence has ended is vested in Congress has particular pertinence in this case where withdrawl of recognition from the Puyallup Tribe (at least in the view of the lower court) effectively would abrogate a solemn treaty commitment of the United States.

As indicated above, I likewise agree with the closing statement in the brief of the amicus curiae Association of Indian Affairs, Inc., which states:

The Superior Court's Findings of Fact and Conclusions of Law clearly fail to measure up to this standard. Neither the findings nor the memorandum deal with the critical question—i.e., whether the State could accomplish its conservation objectives through more rigorous regulation of non-Indian fishing or by other means not having an impact upon appellants. Similarly, the court

below appears not to have considered whether preservation of the Puyallup River fishery, assuming the need for regulation, requires so severe a curtailment of Indian fishing as the respondents here seek to impose. Such disregard for the applicable law, particularly as enunciated by the United States Court of Appeals for this Circuit, cannot be allowed to stand.

In summary, unlike their non-Indian fellow-citizens, enrolled members of the Puyallup Tribe have a vested property right under the Treaty of Medicine Creek to fish at all usual and accustomed places outside their reservation. This off-reservation right to take fish, so essential to the Indians' very existence, is protected under Federal law, and, at the very least, may be limited by State law only under extraordinary circumstances. As a matter of law, the Washington conservation statutes and regulations may not be enforced against Indian treaty fishing rights in the same manner as they are against the bare fishing privileges of other persons. In the former situation, unlike the latter, the State of Washington has the burden of proving affirmatively that application to appellants of the attempted regulations is indispensable to the conservation of the fish resource and the task of further proving that the desired conservation goals cannot be achieved in some other fashion. Respondents made no such showing in the lower court.

Unless it be held that Indian treaties are not treaties within the meaning of the Supremacy Clause of the United States Constitution and hence are not the supreme law of the land and do not override the police power of the states (contrary to the holding of the Supreme Court, cited below)[8], I can only reach the conclusion that the judgment and decree of the trial court should be reversed with directions to dismiss the action.

---

[8]See cases discussed in the first *Satiacum* opinion (50 Wn.2d at pages 516-519).

In *State v. Quigley*, 52 Wn.2d 234, 324 P.2d 827 (1958), a case in which a non-treaty Indian claimed the right to hunt deer on his own property without a hunting license, this court, in a unanimous en banc opinion concluded with this dictum: "Of course, a treaty takes precedence over a state law, but appellant has no treaty rights that restrict the state in its exercise of the police power. Our question, therefore, must be answered in the affirmative."

I am further of the opinion that respondents have failed to prove either that the state laws and regulations here involved are *either* indispensable or reasonably necessary to the conservation of salmon fishery on the Puyallup River and hence would reverse and dismiss for that reason.

HUNTER, J. (dissenting)—I dissent. The ultimate holding of the majority is that the Puyallup Indians are subject to *regulations reasonable and necessary* for the preservation of the fishery. The majority's modification of the trial court's injunction when read with this holding is not consistent. The trial court properly applied our existing conservation laws to the Puyallup Indians by its injunction. The power of the state of Washington to regulate fishing for purposes of conservation has been clearly recognized as applying to the Indians *equally with others* by the United States Supreme Court in the case of *Tulee v. Washington,* 315 U. S. 681, 684, 86 L. Ed. 1115, 1119, 62 Sup. Ct. 862, 864 (1941). In this case Justice Black for the court stated:

> We think the state's construction of the treaty is too narrow and the appellant's too broad; that, while *the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish,* it forecloses the state from charging the Indians a fee of the kind in question here. (Italics mine.)

Our present laws and regulations relating to the use of gear, and the time and place of taking fish are for no other purpose than the reasonable and necessary preservation of the fishery. These laws and regulations accomplish the purpose of the ultimate holding of the majority and therefore should have been imposed on the Indians *equally with others* as was done by the trial court.

In my opinion the ultimate holding of the majority is consistent with the injunction entered by the trial court, and there is no need for its modification.

ROSELLINI and HALE, JJ., concur with HUNTER, J.

HALE, J. (concurring in the dissent)—I agree with and have signed Judge Hunter's dissenting opinion. As a pref-

ace to further comment, it should be noted that this case has nothing to do with protecting or preserving for the Indians any rights in land or personal property or fostering their management of business or tribal affairs. It involves only the claims of a right to fish in places where all others are forbidden.

Appellants assert the right under a treaty to violate the laws of a sovereign state, laws designed to preserve, protect and develop a great natural resource that contributes vastly to the economic and recreational welfare of millions of its citizens. Appellants claim powers which, if exercised in full, will inevitably destroy this resource in the Puyallup River.

I find no language in the Treaty of Medicine Creek (10 Stat. 1132) concluded December 26, 1854, by Isaac I. Stevens, Governor and Superintendent of Indian Affairs of the Territory of Washington, on behalf of the United States and the "chiefs, head-men, and delegates of the Nisqually, Puyallup, Steilacoom, Squawskin, S'Homamish, Stehchass, T'Peeksin, Squi-aitl, and Sa-heh-wamish tribes and bands of Indians,"[9] warranting the conclusion that the Indians should be forever immune from the state's game and fishery laws. The most cogent language of the treaty, that particular phraseology designed to prevent unfair and invidious discrimination against the Indians and which vouchsafed to them the right to hunt and fish, granted these very rights *in common with all citizens of the territory*. See Treaty with Nisqualli, Puyallup, Etc., 1854, art. 3, 2 Indian Affairs, Laws and Treaties 496 (1902). As I would permit no discrimination against the descendants of the Puyallups, I would allow no discrimination in their favor either.

In my opinion, most of the decisional law written about Indian treaties, although intended to protect the American Indian in the rights to property and the pursuit of happiness, has had a contrary effect. Decisions relating to Indian treaties begin with the hope of protecting the Indian, and

---

[9] 2 Indian Affairs, Laws and Treaties 495 (1902).

inevitably end by treating the Indians as aborigines, and in doing so not only have tended to degrade the Indian and perpetuate the stigma of second-class citizenship earlier surrounding him but blinded this country to the need for legislation which will genuinely rehabilitate our Indian citizens and enable them to play a full and active role in the affairs of this state and country in common with all citizens of whatever racial origin.

The majority decision fosters an illusion that somehow by regarding the Treaty of 1854 as a device to confer upon shareholder members in appellant, The Puyallup Tribe, Inc., special privileges, immunities and emoluments not shared equally with descendants of the white settlers of 1854 or the citizenry at large, the courts are righting a wrong long suffered by the Indians.

But while intending otherwise, the opinion discriminates in favor of the Indians, granting to a few of them special favors, privileges and immunities not claimed or shared by other Indians, and perpetuating the idea that a treaty with the natives in 1854 is a viable compact with their remote descendants. In holding thus, the decision again delays the day when some descendants of the Puyallups will achieve full responsibility as citizens. I would put an end to such an invidious and discriminatory concept, and read the treaty as it was written.

Next, on the question of tribal existence, I think the evidence establishes and the learned trial judge rightly found that appellant, The Puyallup Tribe, Inc., never acquired nor now has any rights under the treaty. I believe that the tribe or band which signed the Treaty of Medicine Creek of 1854 has long since disappeared, its lands sold and descendants absorbed into the body politic and that the conclusion of the learned trial judge that

> There is no presently existing Puyallup Tribe of Indians which succeeds in interest to the original Puyallup Indian Tribe which was signatory to the Treaty of Medicine Creek.

is well supported by both the history of the tribe and the

·evidence in the case. This finding and the judgment should be affirmed.