[No. 40267.    En Banc.    April 15, 1971.]

THE STATE OF WASHINGTON, *Respondent*, v. ROBERT MOSES *et al., Appellants.*

*Edmund J. Wood, William L. Hanson,* and *Michael H. Rosen,* for appellants.

*Charles O. Carroll, Prosecuting Attorney, Paul M. Acheson, Assistant Chief Criminal Deputy,* and *Darrell E. Lee, Deputy,* for respondent.

*Slade Gorton, Attorney General, Joseph L. Coniff* and *William F. Lemke, Assistants,* amici curiae.

HALE, J.—Evanescent as the morning mists on the shimmering waters of Puget Sound is the law of Indian treaties. One moment it is there, soon to vanish in a swirl of conflicting, diverging and incomprehensible precedents. Deci-

sions intended to declare the meaning and to describe the effect and operation of Indian treaties tend in time to generate a system of judicial vapor trails which obscure more often than elucidate the treaties under consideration. This is another Indian fishing case that leaves unanswered more questions than it resolves.

In a written memorandum opinion, the learned trial judge aptly summarizes the operative events:

This was no crime of stealth, for the Muckelshoot Indians had announced days in advance that members of their tribe would drop their gill nets in the upper reaches of the Green River, and thus force an arrest by which means the Muckelshoots could test their claimed right to fish with gill nets at "their usual and accustomed fishing stations".

Representatives of the newspapers, television stations and the State Game Department were present to record the event. The first sweep of the defendants' gill net failed to catch even a single fish, but another attempt, aided by rocks thrown by friends to scare the steelhead into the net, yielded eight steelhead.

The State Game protectors of course arrested the defendants, charging them with illegally fishing with gill nets, contrary to the provisions of RCW 77.16.060.

The defendants were all convicted in justice court, and this appeal followed. The State is here represented not only by the Prosecuting Attorney's office, but by the two Assistant Attorneys General assigned to the Game and Fisheries Department. The defendants are represented by attorneys from the American Civil Liberties Union, from the Legal Services Center, and from the United States Attorney's office. It is openly claimed by the prosecution that the United States Department of the Interior is here attempting to "get its foot in the door" so that it may later regulate Indian fishing on the rivers in Washington. This claim is disregarded because it could not affect the result of the case.

The fact that the defendants fished on the day named with a gill net in the Green River and caught steelhead trout is shown on numerous photographs and motion pictures exhibited in court and is not controverted.

Although the facts of the case are uncomplicated, the is-

sues of law sought to be raised are complex, tortuous and vague. March 1, 1966, defendants were seen by the state's officers gillnetting with meshed linen nets in the Green River at the Slaughterhouse Hole near Auburn upstream ½ mile from the bridge on highway No. 18. The defendants' nets nearly spanned the river there, but they caught no fish.

Failing to make a catch at the Slaughterhouse Hole, the defendants moved their nets upstream about 1 mile to where the New Neely Bridge crosses the Green River. At that place, using a gill net 50 to 60 feet long which was equipped with plastic floats along its top edge and lead weights at the lower edge to keep it upright in the water and which did not span the river there, they made a sweep of about 400 yards. Aided by others who threw rocks into the river to scare the spawning fish into the gill net, the defendants in their third sweep netted eight steelhead trout which they killed with rocks and clubs.

Defendants claimed to be members of the Muckleshoot Tribe. At the places where they had cast their net, the Slaughterhouse Hole and the New Neely Bridge, the Green River runs through privately-owned and county-owned land, and no part of the river or the adjacent lands at either place is within the Muckleshoot Indian Reservation.

The steelhead trout is an anadromous game fish; in early March it swims upstream from salt water to spawn. The steelhead run in Washington's rivers is in part artificially created by fish propagation practices of the state.

Defendants were charged with illegally fishing for game fish in violation of RCW 77.16.060, which, so far as pertinent here, reads:

It shall be unlawful for any person to lay, set, use . . . any . . . nets . . . in any of the waters of this state with intent thereby to catch, take or kill any game fish. It shall be unlawful to lay, set or use a net capable of taking game fish in any waters of this state . . .

Gill-net fishing for steelhead or other game fish, unless

expressly allowed by regulation or written permit, is totally prohibited in this state throughout the year.

Convicted in justice court and sentenced to 6 months in the county jail with 5 months of the sentence suspended, defendants appealed to the superior court. Convicted again in superior court after trial without a jury, they were sentenced to "30 days, suspended, provided the defendant[s] [do] not fish illegally for a period of one year." Contending that they are members of the Muckleshoot Indian Tribe and that the Treaty of Point Elliott of 1855 bars the state from prohibiting the tribe and its members from net fishing for game fish in the Green River, defendants bring this appeal. We affirm the judgment on the precise grounds upon which it rests and do not decide the many other issues raised by this record.

As we understand the issues, if, in the reasonable exercise of its sovereign powers, the state as a reasonable regulatory measure may constitutionally prohibit all persons, including treaty Indians, from any net fishing whatever in the Green River, many of the issues raised at trial and on this appeal need not be decided. Stated another way, if, in order to preserve its fisheries, the state can lawfully prevent all net fishing for game fish, then it becomes immaterial whether the Muckleshoot Tribe has any off-reservation fishing rights and whether the defendants were members of that tribe. Should it be the rule, however, that total prohibition of net fishing for game fish is unreasonable and in excess of the state's sovereign powers, then it becomes pertinent whether the Muckleshoots made a treaty with the United States; whether such a treaty existed at the time of the arrest of these defendants; whether the treaty gave defendants any rights in the Green River not shared by other citizens; whether these rights, if any, belonged to the tribe alone or could be exercised by individual members of it; whether treaty Indians may cross and occupy privately-owned and publicly-owned lands for the purpose of fishing; and, assuming arguendo the existence of any off-reservation fishing rights in the tribe or these defendants,

whether such rights included the right to use a long linen gill net with plastic floats and lead weights.

Concluding that, because the state had not exceeded reasonable regulatory powers in totally prohibiting net fishing for game fish in the Green River, the court ruled that a total prohibition of net fishing for steelhead would not violate whatever off-reservation fishing rights defendants might have. On this basis, the trial court held that, even though the Muckleshoot Tribe did have off-reservation fishing rights and defendants were members of that tribe, their tribal status did not relieve them from what the court held to be a reasonable and unexcessive regulation. Accordingly, since the state had shown total prohibition of net fishing to be a reasonable regulatory measure in preserving a fishery, the trial court did not specify the kind or nature of the off-reservation fishing rights deriving from the treaty nor did it pass upon or construe the treaty provision that the right of taking fish at usual and accustomed grounds is secured to the Indians *"in common with all citizens of the Territory."* Surprisingly little judicial attention, we note, has been given to this rather standard treaty language.

Defendants invoked the Treaty of 1855 concluded with the Indians on the shores of Puget Sound by the United States Government. January 22nd of that year, Isaac I. Stevens, as Governor and Superintendent of Indian Affairs for the Territory of Washington, and his official party acting for the United States met with a number of chiefs, headmen and delegates of certain named tribes and bands of Indians. There, at a place designated in the treaty as Mucklteoh or Point Elliott, they concluded what is described in the treaty as "Articles of Agreement and Convention." 12 Stat. 927 (1863). Article 1 of the Treaty of Point Elliott, without acknowledging ownership or possessory rights in them, declared that the Indian signatories ceded, relinquished and conveyed to the United States all of their right, title and interest in the lands they had traditionally occupied. Article 2, reserving for the use and occupancy of these Indians designated areas or reservations,

contained a provision that no "white man [shall] be permitted to reside upon the same without permission of the said tribes or bands."

Article 5 is the basis upon which defendants here set up their affirmative defense to the charge of illegal net fishing. It says:

> Article V. The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands. Provided, however, that they shall not take shell-fish from any beds staked or cultivated by citizens.

Defendants did not take the witness stand, but, along with other evidence, presented the testimony of Dr. Barbara Lane, an anthropologist, to establish that they were members of the Muckleshoot Tribe of Indians and that the tribe was one of the signatories to the Treaty of Point Elliott. Despite almost continuous objections to this testimony aimed at its hearsay nature, its vagueness and want of materiality and relevance to prove with reasonable certainty the two issues, the court admitted it. Ultimately, over the state's strenuous exception, the court entered findings of fact that the Muckleshoot Tribe of Indians was party to the treaty and that defendants were members of the tribe.

These findings were entered despite findings Nos. 9 and 10 in which the court also found that in other litigation both the Muckleshoot Tribe and two of the defendants here, Cecil Moses and Larry V. Maurice, were neither signatories to nor beneficiaries of the treaty.[1]

---

[1]Findings of Fact Nos. 9 and 10: "9. The Muckleshoot Tribe of Indians and defendants herein Cecil Moses and Larry V. Maurice were defendants in a civil lawsuit, *State of Washington v. Herman Moses, et al,* King County Cause No. 609180 (1965), which case tried the issue of alleged Muckleshoot Indian treaty rights. This issue is identical to the one raised by defendants herein. That court found that the named defendants and

It is generally held in criminal cases that, if the facts of an affirmative defense lie immediately within the knowledge of the defendant, the onus probandi, under the principle of "balancing of convenience," should be his. *State v. Harding,* 108 Wash. 606, 185 P. 579 (1919); *State v. Shelton,* 16 Wash. 590, 48 P. 258, 49 P. 1064 (1897); *Morrison v. California,* 291 U.S. 82, 78 L. Ed. 664, 54 S. Ct. 281 (1934); *Rossi v. United States,* 289 U.S. 89, 77 L. Ed. 1051, 53 S. Ct. 532 (1933); 9 Wigmore, Evidence §§ 2486, 2512 (3d ed. 1940). *See, also, United States v. Sisson,* 399 U.S. 267, 26 L. Ed. 2d 608, 90 S. Ct. 2117 (1970), in which the defense of being a conscientious objector was held to be an affirmative defense to an indictment charging refusal to submit to induction into the armed forces, and the indictment, phrased in the language of the statute, was held good because the accusation need not anticipate affirmative defenses nor negate them.

▮▮▮ An affirmative defense to a criminal charge, therefore, must be proved by one who relies on it. *State v. Razey,* 54 Wn.2d 422, 341 P.2d 149 (1959); *State v. Brown,* 97 R.I. 95, 196 A.2d 138 (1963); 29 Am. Jur. 2d *Evidence* § 156 (1967). If one accused of violating the state's fishing laws and regulations claims a treaty exemption to their operation, his claim constitutes an affirmative defense and he has the burden of showing by a preponderance of the evidence the existence of the treaty, that he is a beneficiary of it and that the treaty as a matter of law bars as to him the operation and enforcement of the fishing laws and regulations. *State v. James,* 72 Wn.2d 746, 435 P.2d 521 (1967); *Department of Game v. Puyallup Tribe, Inc.,* 70 Wn.2d 245, 422 P.2d 754 (1967), *aff'd* 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968). The affirmative defense must be assessed,

---

the Muckleshoot Tribe of Indians were not signatories or beneficiaries to the Treaty of Point Elliott, executed January, 1855."

"10. The Muckleshoot Tribe of Indians has twice filed suit in federal courts alleging that they are not 'treaty indians,' *Duwamish et al Indians v. U.S.,* 79 C.Cls. 530 (1934), cert den 295 U.S. 755, and *Muckleshoot Tribe of Indians v. U.S.,* Indian Claims Commission Docket No. 98."

too, in light of the rule that, whatever rights are said to have accrued to Indian tribes by virtue of a treaty with the United States accrue to the tribes and not their individual members. *Whitefoot v. United States*, 293 F.2d 658 (Ct. Cl. 1961). The government did not deal with individuals or families of Indians but with tribes. *Sac & Fox Indians of the Mississippi in Iowa v. Sac & Fox Indians of the Mississippi in Oklahoma, & the United States*, 220 U.S. 481, 55 L. Ed. 552, 31 S. Ct. 473 (1911).

The trial court found that defendants sustained the burden of proving tribal membership in a tribe possessing off-reservation fishing rights. It held that the Muckleshoots were signatories to the Treaty of Point Elliott and that the defendants were beneficial members of that tribe. Although the state challenges these findings, contending that there is a lack of substantial evidence to support them, we do not reach this issue. We do not decide whether the evidence or the law supports either finding because, without more, we think the judgment must be affirmed on the basis upon which it rested, *i.e.*, that, regardless of the treaty or any asserted rights claimed to derive from it, the state could lawfully bar all net fishing for game fish in the Green River. The court's conclusion that, even if the treaty be so construed as to accord the Muckleshoot Tribe and its component members off-reservation fishing rights in the Green River, the members and the tribe as an entity could be lawfully subjected by the state to total prohibition of net fishing for game fish in that river is, we think, a sound one. See, *Regulation of Treaty Indian Fishing*, 43 Wash. L. Rev. 670 (1968).

We point out that the court's findings and conclusions did not put to rest many vital issues of Indian fishing law. In *State v. Moses*, 70 Wn.2d 282, 422 P.2d 775 (1967), this court affirmed the conclusion of the trial court that the Muckleshoot Tribe of Indians descended neither from tribal signatories nor their successors and had no rights under the Treaty of Point Elliott. While this adjudication is perhaps not res judicata of the point, it is entitled to great weight in

the premises, deriving as it did from a vigorously adversary proceeding.

Accordingly, we do not now pass upon or decide many of the questions raised directly or by ineluctable inference in this appeal. We do not, for example, construe the language of the treaty that the right of taking fish at usual and accustomed grounds and stations is secured to the Indians in common with all citizens of the territory, nor do we determine the effect of national and state citizenship upon the descendants of treaty Indians.[2] In 1924, by act of Congress (Citizenship Act of 1924, 43 Stat. 253), Indians born to American Indians, while retaining tribal or other property, were declared to be citizens of the United States. 8 U.S.C. § 1401(a)(2). They thus, under the fourteenth amendment to the Constitution of the United States became citizens of the state in which they live even though residing on a reservation. Whether the status of state and national citizenship affects off-reservation treaty rights, if any, is not to be decided directly or inferentially in this appeal.

Nor need we decide whether the Muckleshoot Tribe of Indians, a federally incorporated and chartered legal entity organized in 1936 in accordance with 25 U.S.C. § 477 (1934), and the four defendants are the lineal and beneficial descendants of tribes or bands recited in the treaty as Skope-ahmish, Smalh-kamish and St-kah-mish. The trial court found that "No separate tribe of Skope-ahmish Indians is presently in existence," but that Indians known by that name, along with other Indians, were moved onto the Muckleshoot Reservation before 1874, and that, although the treaty does not show that it was signed by anyone on behalf of the Skope-ahmish, at least one member of that group was present at Point Elliott when the treaty was concluded. Whether the Muckleshoot Tribe, Inc., off-reservation fishing rights, if any, inure to the individual benefit of its members or are reserved to the tribe as a corporate, juridical entity, are questions not necessary for a decision

[2]The precise treaty language is "in common with all citizens of the Territory."

now, either. We also do not decide whether there was substantial admissible evidence to support the court's finding that the Muckleshoot Tribe of Indians as presently incorporated is the beneficial successor in interest to any of the tribal signatories of the 1855 Treaty of Point Elliott (12 Stat. 927 (1863)), or whether any of these defendants were members of that tribe. And we do not decide whether, or to what extent, treaty Indians claiming off-reservation fishing rights may possess easements to enter upon, pass through or occupy private or public lands in fishing off the reservation.

The determinative issue before us and upon which an affirmance or reversal depends is whether total prohibition of gill-net fishing for steelhead trout in the Green River was reasonable, and the issue urged by the state that there was insufficient admissible evidence in the record to support the court's findings of tribal membership and treaty benefits is not decided. Resolution of these and other issues raised in this review is left to another day—or more happily to a speedier solution by the Congress.

Thus, without reaching the other questions referred to, we come to the one determinative issue: Did the state have the power to prohibit totally net fishing for steelhead trout in the Green River, regardless of the Treaty of Point Elliott of 1855? Under its sovereign power, we think that total prohibition was demonstrated to be reasonably necessary for the preservation of a state fishery resource.

■ Fish, while in a state of freedom, are the property of the sovereign power in whose waters they may be. In the United States, it is the state and not the United States which is the sovereign power in whose waters the fish are, and the state owns the fish in its sovereign capacity as the representative of and for the benefit of all people in common. 36A C.J.S. *Fish* § 2 (1961). This state has affirmed the rule of state sovereign ownership over wild animals, wild birds, and fish freely swimming in this state's waters. *State ex rel. Bacich v. Huse,* 187 Wash. 75, 59 P.2d 1101 (1936); *Judd v. Bernard,* 49 Wn.2d 619, 304 P.2d 1046 (1956);

*Wiegardt v. State,* 27 Wn.2d 1, 175 P.2d 969 (1947); *Mc-Millan v. Sims,* 132 Wash. 265, 231 P. 943 (1925); *Vail v. Seaborg,* 120 Wash. 126, 207 P. 15 (1922); *State v. Tice,* 69 Wash. 403, 125 P. 168 (1912). Thus, the fish in the waters of the state and the game in its forests belong to its people (*Geer v. Connecticut,* 161 U.S. 519, 40 L. Ed. 793, 16 S. Ct. 600 (1896)), and the legislature was doing no more than declaring legislatively what already was the law when, in RCW 77.12.010, it said:

> The wild animals and wild birds in the state of Washington and the game fish in the waters thereof are the property of the state. The game animals, fur-bearing animals, game birds, nongame birds, harmless or song birds, and game fish shall be preserved, protected, and perpetuated, and to that end such game animals, fur-bearing animals, game birds, nongame birds, harmless or song birds, and game fish shall not be taken at such times or places, by such means, in such manner, or in such quantities as will impair the supply thereof.

*Tulee v. Washington,* 315 U.S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942), reversing *State v. Tulee,* 7 Wn.2d 124, 109 P.2d 280 (1941), frequently cited for all manner of propositions, seems to support a strong power to regulate the taking of fish vis-a-vis treaty rights, and goes no farther than to hold that the state could not impose a *license fee* upon treaty Indians exercising a regulated right to fish. The court said:

> [W]hile the treaty leaves the state with power to impose on Indians, *equally with others,* such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here.

(Italics ours.) The exaction of a license fee from treaty Indians to do what the state acknowledged at the time to be lawful under the circumstances was not essential to a state conservation program. While conceding a regulatory power in the state to preserve its fishery resources, *Tulee* actually went no further than to hold that demanding a license fee of tribal Indians was not a true conservation measure. *See*

*Puyallup Tribe v. Department of Game,* 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968).[3]

We recognize that the term "reasonably necessary" may to a degree be wanting in definition, but it is a model of precision when compared to much of the law written about Indian treaties. If total prohibition of net fishing for game fish is a reasonably necessary exercise of state conservation practices to preserve or enlarge the steelhead runs on the Green River, then that would resolve all issues raised by appellants and the judgment should be sustained.

Did the state show by competent evidence that total prohibition of net fishing for game fish in Green River was reasonably necessary for preservation of the state's fisheries in that river? Clifford Millenbach, Chief of the Fisheries Management Division of the Washington State Department of Game and a professional biologist testifying for the state, said that it was quite likely the steelhead run would be destroyed if net fishing were allowed. He used data from the Puyallup River—which is fed by the White River—as a comparison. He testified that, by actual count beginning in 1941, the state transported between 1,000 and 2,000 steelhead annually around Mud Mountain Dam for the first 14 years of the count. Then, during an interval of an extensive Indian net fishing on the Puyallup, the annual count started falling off until 1958 when it reached a low of 156 steelhead. Since 1958, with the cessation of net fishing, the count has been on the rise. He said that, in his professional opinion, no net fishing should be allowed on the Green River because a net has the capability of literally sweeping

[3]"The idea that the conservation measure be 'indispensable' is derived from *Tulee v. Washington, supra* [315 U.S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942)], where in striking down the license fee we said that 'the imposition of license fees is not indispensable to the effectiveness of a state conservation program.' 315 U.S., at 685. But that statement in its context meant no more than that it would, indeed, be unusual for a State to have the power to tax the exercise of a 'federal right.' As stated by the Court in the sentence immediately following, the license fee 'acts upon the Indians as a charge for exercising the very right their ancestors intended to reserve.' " *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 401 n.14, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968).

the river, will overharvest the run, and thus will prevent adequate escapement for spawning.

Dr. Loren R. Donaldson, Professor of Fisheries at the University of Washington, testifying for the state, when asked what the term "conservation" means, said, "Well, I think conservation means the maximum sustained yield, commensurate with maintaining the run at the optimum level." Although a steelhead lays some 4,000 to 5,000 eggs, it is error to expect they will produce several hundred fish. "In actuality," Dr. Donaldson said, "under about the best of natural conditions, on an average, about all we can expect is a one for one increase. There are instances where it exceeds this, but in the main half the fish have to be reserved for the brood stock or the spawning stock." Once the anadromous fish have left salt water and entered fresh water, they should be allowed to spawn. A fish entering a river to spawn deteriorates rather rapidly in quality, he said, once it has entered the fresh water.

Dr. Donaldson's testimony, in essence, was that a prohibition against net fishing in the Green River would be reasonably necessary for conservation. He said that a gill-net fishery was specially destructive of the run because it is one of the most destructive ways of catching fish; that while a gill net may catch some of the fish it will at the same time entangle and gill mark others which will die from the gill marking. Making a comparison, he said that the gill-net fishery above Bonneville Dam on the Columbia was "a matter of record, where large numbers of fish are destroyed there by being caught in the net and falling out and not being brought in."

J. E. Lasater, Assistant Director of Operations for the Department of Fisheries, and a biologist, testified for the state. Referring to a net fishery for anadromous fish on the Green River, he said it would conflict with conservation and that "If the net fishery is employed there, it will reduce the stock of both wild and hatchery fish, and also reduce our ability to use the hatchery to its full production potential." The state, said Mr. Lasater, allows no net fishing

at all on Puget Sound rivers and streams except on Indian reservations because, since 1918 or 1920, the net fisheries, as he put it, were being required to phase out. Continuous scientific studies had shown since then, he said, that net fishing in rivers and streams was too detrimental to be permitted.

The department had learned from these studies, according to Mr. Lasater, that closures for intervals, or partial closures, in rivers and streams did not work to conserve the runs because, as fish return into fresh water, they tend to delay there in what the biologists call "holding water" and that opening and closing the rivers at intervals by regulation would not allow adequate escapement because the same fish are fished for over and over again in these holding waters. He testified on this:

> The second criteria is that it be in what I will call passage of water, and that's better explained by saying that as fish come into the river, they tend to delay, and this is what we call holding water.
>
> Closures for escapement don't work in holding water for this reason, if you have a closed period, say, three days to allow for escapement and the fish don't move, and you re-open the fishery, you're fishing the same fish a second time and without an absolutely accurate knowledge of rate of removal and when the fish might migrate, and all, you fish over the same stock time after time, and in fact do not know how to regulate a net fishery to assure a spawning escapement under these conditions.

Fishing should not be allowed on the spawning ground for another reason, he said. Net fishing in the spawning grounds is a harassment to those steelhead which are not actually caught or killed in the nets. Spawning fish, he said, should have a quiet place in which to settle down and spawn. If they are harassed and they are not allowed to lie quietly during the holding period in holding waters, this produces a high prespawning mortality. He testified:

> This means that the fish has a certain energy supply to carry them through the spawning act. If during this holding period they are harassed they use up that energy, and the result is what we call pre-spawning mortalities, fish

just not having the energy to carry on through the spawning act.

They go for, in the case of salmon, sometimes several months, and with steelhead sometimes as much as six months, with very little food, so you have the effect of disruption of the spawning act, diminishment of spawning success with even the direct death of the fish even though they are not caught.

After giving some 20 pages of essentially scientific explanation of the habits and characteristics of anadromous fish and the effects of net fishing on their propagation, Mr. Lasater testified:

Q. Now, would a net fishery in the Green River for anadromous fish conflict with conservation? A. Yes, it would. You couldn't attain your conservation goals with a net fishery in the river. Q. Do you have an opinion as to the effect of the continuation of the net fishery, or do you have an opinion as to the effect of a net fishery on the runs of anadromous fish in the Green River? A. If the net fishery is employed there, it will reduce the stock of both wild and hatchery fish, and also reduce our ability to use the hatchery to its full production potential. Q. Mr. Lasater, in your opinion is it reasonably necessary for conservation to enforce the statutory provision on the use of nets in the Green River upon the defendants in this case? A. Yes, it is. Q. And how about on everyone else? A. Yes, it's the wrong gear in the wrong place, and often it would be at the wrong time.

The record thus amply supports the trial court's finding No. 19 that:

The use of gill nets in the catching of anadromous fish is destructive of the runs of those fish, since gill nets tend to eliminate certain segments of the runs, and in addition injure and frighten many fish which are not caught. Some stocks of fish would be eliminated if gill nets were allowed in rivers such as the Green River, and past gill net fisheries have reduced some anadromous fisheries almost to the point of destruction.

and conclusion No. 2 that:

The regulation prohibiting the use of gill nets in the rivers of the State of Washington is reasonable and necessary for the preservation of the steelhead fishery.

This means, therefore, that total prohibition of net fishing for game fish on the Green River was shown to be a reasonably necessary regulation for conservation of the steelhead fishery resource and that regardless of whatever exempt status the defendants had, or claimed to have, the judgments and sentences should be affirmed. *State v. McCoy*, 63 Wn.2d 421, 387 P.2d 942 (1963); *Puyallup Tribe v. Department of Game*, 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968).

Judgment affirmed.

HAMILTON, C.J., ROSELLINI and HUNTER, JJ., and HILL, J. Pro Tem., concur.

FINLEY, J. (dissenting)—Although I must disagree with much of the reasoning and the result reached in the majority opinion, I certainly agree with its comment that the law of Indian treaties has suffered from a most disjointed and enigmatic development in published opinions of the courts on this most important subject. This fact of life makes careful and considered analysis of Indian treaty provisions all the more important when treaty provisions are at issue within the confines of a legal controversy. And, certainly, such an issue *is* present in the instant case.

The appellants herein stand charged and convicted of violating a criminal statute, *i.e.*, RCW 77.16.060, prohibiting the use of certain devices—including gill nets—in the capture of *game* fish. Their defense is that the statute is in derogation of their federally-secured treaty fishing rights and, consequently, is void as applied to them. In an effort to answer this defense, it seems to me that the majority becomes involved—if not lost—in a judicial verbalistic exercise or quagmire. The majority never definitively comes to grips with a fundamental task which I think is clearly required in the instant case; *viz.*, the interpretation of those most pertinent federally-secured treaty fishing rights.

Under our constitutional framework, courts of law are assigned the function, albeit difficult or arduous, of interpreting and giving legal effect to duly constituted and le-

gally binding treaties. In glossing over or avoiding this crucially important issue, the majority, in my opinion, exacerbates and *expands* rather than dissipates the "system of judicial vapor trails which obscure more often than elucidate the treaties under consideration."

In disposing of the instant appeal, the majority states:

> [W]e come to the one determinative issue: *Did the state have the power to prohibit totally net fishing for steelhead trout in the Green River, regardless of the Treaty of Point Elliott of 1855?* Under its sovereign power, we think that *total prohibition was demonstrated to be reasonably necessary* for the preservation of a state fishery resource.

(Italics mine.) The determination that a given state regulation is "reasonably necessary" for the preservation of a state fishery resource *cannot* be made in a judicial vacuum. Simply stated, the essence of all resource conservation is the recognition that the given natural resource is not sufficiently abundant to survive unrestricted taking by all competing users. And, thus, it is axiomatic that whenever any scarce resource or commodity must be conserved, its distribution among various competing users must, necessarily, be achieved by some system of allocation.

To judge whether any given conservation regulation is reasonably necessary to preserve the resource, one must additionally ask: *"Preserve the resource for what uses?"* It is, perhaps, analytically useful to restate an obvious fact: natural resources, unlike many scarce commodities, do not lend themselves to satisfactory allocation through a convenient market mechanism which can be said to be reliable and appropriate. Rather, the allocation of natural resources has traditionally fallen within the ambit of state action. I fully support the majority's analysis that the state, in the exercise of its sovereign power, has broad authority to regulate its fishery resources, as well as other natural resources within its borders. Indeed, it can normally be said that the state's power to allocate its resources among competing users is plenary. This statement is, however, too broad in the instant case *because* of the fundamental differ-

ence presented herein—*i.e., limitations or restrictions inherent in the existence of federally-secured treaty fishing rights.*[4]

Article 5 of the Treaty of Point Elliott provides in relevant part:

> *The right of taking fish at usual and accustomed grounds and stations is further secured to said Indians in common with all citizens of the Territory* . . .

(Italics mine.) 12 Stat. 927 (1863). I have indicated agreement with the majority's statement that the above-quoted treaty language has received "surprisingly little judicial attention." I cannot agree with either the trial court's or the majority's candid refusal to interpret and effectuate that language as a *critical element* in determining whether, in the instant case, the questioned state regulation is *reasonably necessary* for the preservation of a state fishery.

The determinative issue in this appeal, as I view it, is: To what extent, if any, do the treaty provisions, insofar as they secure certain Indian fishing rights, conflict with, *and thus supersede,* RCW 77.16.060? Stated in another light, does article 5 of the Treaty of Point Elliott secure to the appellants, as its beneficiaries, certain fishing rights which the state has failed to recognize in the statutory regulation adopted and applied as to appellants in this criminal case?

Unquestionably, Indian treaties are accorded the same force and effect as treaties with foreign nations. Consequently, such treaties are the supreme law of the land and are binding upon state courts and state legislatures. No state law or regulation may impinge upon rights granted or reserved by such treaties. *Cherokee Nation v. Georgia,* 30

---

[4]*See e.g., Graves v. Dunlap,* 87 Wash. 648, 651, 152 P. 532 (1915), wherein this court stated: "The state, through its legislature, has the right to control for the common good the killing, taking and use of game, *so long as rights guaranteed either by the state or Federal constitution are not encroached upon.*" (Italics mine.) *See also Tulee v. Washington,* 315 U.S. 681, 86 L. Ed. 1115, 62 S. Ct. 862 (1942), holding that treaties take precedence over state conservation laws which are void and ineffective insofar as their application would infringe on rights secured by treaty.

U.S. (5 Pet.) 1, 8 L. Ed. 25 (1831); *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L. Ed. 483 (1832); *Blue Jacket v. Johnson County Comm'rs (Kansas Indians)*, 72 U.S. (5 Wall.) 737, 18 L. Ed. 667 (1866); *Holden v. Joy*, 84 U.S. (17 Wall.) 211, 21 L. Ed. 523 (1872); *United States v. Winans*, 198 U.S. 371, 49 L. Ed. 1089, 25 S. Ct. 662 (1904); *State v. Satiacum*, 50 Wn.2d 513, 314 P.2d 400 (1957); *State v. James*, 72 Wn.2d 746, 435 P.2d 521 (1967).

The applicable principles for construing Indian treaty language have been stated by the United States Supreme Court:

> It is our responsibility to see that the *terms of the treaty* are carried out, so far as possible, *in accordance with the meaning they were understood to have by the tribal representatives* at the council, and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

(Italics mine.) *Tulee v. Washington*, 315 U.S. 681, 684, 86 L. Ed. 1115, 62 S. Ct. 862 (1942). *But see New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 60 L. Ed. 1166, 36 S. Ct. 705 (1916).[5]

It is therefore necessary, first, to ascertain, insofar as is

---

[5]Therein, Justice Hughes commented:

> It has frequently been said that treaties with the Indians should be construed in the sense in which the Indians understood them. But it is idle to suppose that there was any actual anticipation at the time the treaty was made of the conditions now existing to which the legislation in question was addressed. Adopted when game was plentiful—when the cultivation contemplated by the whites was not expected to interfere with its abundance—it can hardly be supposed that the thought of the Indians was concerned with the necessary exercise of inherent power under modern conditions for the preservation of wild life.

*Kennedy*, 241 U.S. at 563-64. The statements in *Tulee* and *Kennedy* are not irreconcilable. Rather, as is later developed in this dissent, the crucial judicial function required in cases wherein state regulations are alleged to conflict with Indian treaty rights must, of necessity, include a 2-step analysis: (1) determination of the *quantum of rights originally granted or reserved* by such treaties; and (2) determination that a state regulation, mandated by the exigencies of modern resource conservation, properly *recognize and preserve those rights* originally granted or reserved, *in proportionate quantum.*

possible, the quantum or nature of rights secured to the beneficiaries of the Treaty of Point Elliott, as those rights were understood by the treaty's Indian signatories. As previously noted, the treaty right disputed herein is the Indians' *right to take fish at usual and accustomed grounds and stations in common with all citizens of the state.* It is reasonable to presume that the Indian signatories of the Treaty of Point Elliott understood that document to *preserve* their previously unfettered right to take fish in the manner, to the extent, and for the purposes that such fish had been taken by the Indians prior to the settlement of the West by the white man. It seems obvious to me that such rights were *retained* by the Indian signatories. These rights were *not granted to them but "further secured"* by the Treaty of Point Elliott "in common with all citizens of the Territory." While it is true that the Indian signatories to the treaty literally surrendered many rights in exchange for certain benefits, the right to fish was not one of those rights surrendered. *See United States v. Winans, supra.*

It is relevant to ask the question: What is the probable extent of the Indians' use of the fishery resource prior to formation of the treaty? The trial court, in the instant case, found that "[t]he steelhead was a food fish taken by the indian prior and subsequent to 1855, . . ." Indeed, the abundance of fish in the rivers of Puget Sound played a strong role in the physical and cultural environment of the Indian. This dependence has been graphically documented:

> The basis of the aboriginal economy was fishing. However, salmon was not merely an important part of life— not a recreation and not solely a means of providing food —it was the heart of a whole way of life. It was the staple article of year-round diet, fresh, smoked, or dried, of which a Chinook man in the treaty days said that "if he was three days without [it] his heart failed him." It was a major commodity in trade between tribes. Above all, it was a blessing for which the Indians always gave thanks.

(Footnote omitted.) Uncommon Controversy: Fishing

Rights of the Muckleshoot, Puyallup, and Nisqually Indians (A Report Prepared for the American Friends Service Committee 3) (U. W. Press 1970). Speaking of Columbia River Indian tribes, a federal court recently noted:

> From the earliest known times, up to and beyond the time of the treaties, the Indians comprising each of the intervenor tribes were primarily a fishing, hunting and gathering people dependent almost entirely upon the natural animal and vegitative resources of the region for their subsistence and culture. *They were heavily dependent upon such fish for their subsistence and for trade with other tribes and later with the settlers.* . . .
>
> During the negotiations which led to the signing of the treaties the tribal leaders expressed great concern over their right to continue to resort to their fishing places and hunting grounds. *They were reluctant to sign the treaties until given assurances that they could continue to go to such places and take fish and game there.* . . .

(Footnote omitted. Italics mine.) *Sohappy v. Smith*, 302 F. Supp. 899, 906 (D. Ore. 1969).

The right to retain access to off-reservation fishing locations was critically significant to the Indians. One scholar, in a definitive study, has noted that:

> [t]he right provided for in the Pacific Northwest treaties whereby the Indians were to be permitted to resort to their ancient tribal fishing grounds or stations for the purpose of taking fish . . . *was at the time of the treaties probably the most important consideration in the minds of the Indian chiefs and headmen.* . . .
>
> . . .
>
> It is not difficult to appreciate the universal concern of the Indians with regard to this matter since they were so dependent in varying degrees on fish and especially salmon for their daily food.

E. Swindell, Report on Source, Nature and Extent of the Fishing, Hunting and Miscellaneous Related Rights of Certain Indian Tribes in Washington and Oregon 58, 59-60 (1942).

Having observed the purposes of, and extent to which, fishing was immensely important to the early Puget Sound

Indian, it is of interest to examine the manner by which these early Indians fished for steelhead and salmon: "Men worked with weirs, canoes, spears, dip nets, and large fiber nets." Uncommon Controversy, *supra,* at 5. Although there is no indication that the early Indians utilized gill nets as such, appellants' anthropologist testified at trial that the Indians' use of weirs was extensive. She further testified that the early Indians employed dip nets and drift nets, and that the Indians used conservation practices, including the allowing of fish escapement through their extensive weirs. The Pacific Northwest Indian was known to have completely blocked certain streams and to direct incoming fish to a point where they could be easily speared or netted with large dip nets. *See* E. Swindell, Report on Source, et cetera, *supra,* at 17-26, for a definitive study of early native fishing gear utilized by Pacific Northwest Indians.

I thus find it reasonable to conclude that the Indian signatories to the Treaty of Point Elliott intended to reserve unlimited rights to fish in the manner, to the extent, and for the purposes previously employed prior to the treaty. Because these rights were reserved *in common with* all citizens of the Territory [State], it is next *necessary to delineate the meaning of the "in common" language.* It must be admitted that this language—which appears in almost every Pacific Northwest Indian fishing treaty—has long troubled legal scholars and the courts. There is a certain attractiveness to the majority's resolution of this difficult problem of interpretation. But, I am convinced the majority does not fairly or adequately resolve the complex issues presented.

It would, perhaps, be an easy answer to adopt the position previously advanced by the state: that the language—to fish "in common with all citizens of the Territory"—means merely that Indians have only the same rights as given to all other citizens. Such a reading of the language is, however, premised upon the rationale that the fishing activities and interest of the Indians and the settlers of the territory were similar, if not identical; that the Indian sig-

natories *had no rights prior to the treaty*—and that they could only receive rights from the government. As mentioned before, I do not find historical justification for this analysis which would, if adopted, indicate that the treaty-making procedure involved a deceptive exercise on the part of the government. Indeed:

> *Such a reading would not seem unreasonable if all history, anthropology, biology, prior case law and the intention of the parties to the treaty were to be ignored.*
> . . .
> The policy of the United States to extinguish Indian rights in the Oregon Territory by negotiation rather than by conquest was firmly established in the Act of August 14, 1848 (9 Stat. 323) which established the Oregon Territory. That act declared that nothing in it "shall be construed to impair the rights of persons or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, \* \* \*." The act also extended to the Oregon Territory the provisions of the Northwest Ordinance of 1787 which provided, among other things, that "*good faith shall always be observed towards the Indians; their land and property shall never be taken from them without their consent.*" (1 Stat. 51, Note a)
> *The treaties with which we are here concerned are parts of the result of that policy. They are not treaties of conquest but were negotiated at arm's length.* The word of the United States was pledged.

(Italics mine.) *Sohappy v. Smith, supra* at 905. Alternatively, I cannot subscribe to the interpretation assigned to the critical treaty language by Donworth, J., in *State v. Satiacum,* 50 Wn.2d 513, 523-24, 314 P.2d 400 (1957):

> As we interpret the treaty, we believe that the phrase "in common with all citizens of the Territory" merely granted the white settlers and their heirs and/or grantees a right to fish at these places with the Indians, *but that the Indians thereby reserved their right to fish at these places irrespective of state regulation, so long as the right shall not have been abrogated by the United States.*

(Italics mine.)

These conflicting approaches represent two polar extremities. I am convinced that there is a definable and fundamentally more correct position. In my judgment:

[j]udicial recognition of the fundamental purpose of the treaty (*i.e.*, the preservation of Indian fishing rights) and judicial recognition of the facts of life relative to conservation and rehabilitation of fish are not inconsistent. Such judicial action is not in derogation and in violation of the Indian treaty, but is in furtherance thereof.

*State v. Satiacum, supra* at 538 (Finley, J., concurring in the result). State conservation laws are fundamentally laws of *allocation* as well as of *preservation*. Resources are conserved so that they will survive for later use. The particular resource involved in this appeal is the steelhead trout fishery on the Green River. From the earliest times, the steelhead has been a highly prized food source. It is a relatively recent development that this species has become a major recreational attraction to sports fishermen,[6] and that the state legislature has now removed the steelhead trout from the commercial fishery.[7]

I would interpret the "in common with" treaty language to grant its beneficiaries an *absolute right* to fish at usual and accustomed grounds and stations; with such right subject to the state's regulatory powers *only to the extent*

---

[6]It is of passing interest to note that the state legislature, in 1969, enacted RCW 1.20.045, as follows:

The species of trout commonly called "steelhead trout" (salmo gairdnerii) is hereby designated as the official fish of the state of Washington.

[7]RCW 77.08.020 defines the steelhead as "game fish." RCW 77.16.060 (the statute disputed in the instant case) makes unlawful the use of any net to catch game fish. RCW 77.16.040 prohibits the trafficking of game fish "except as authorized by permit or license lawfully issued by the director [of game], or by rule or regulation of the [game] commission." It is significant and should be noted that the state does not attempt to regulate *fishing on reservations* by treaty or nontreaty Indians. In *Pioneer Packing Co. v. Winslow*, 159 Wash. 655, 294 P. 557 (1930), this court held that the Quinault Indians could sell fish caught in reservation streams for transportation into another state. That case further held that the Quinaults "owned" the fish in the Quinault River by the same title and in the same right as they owned them prior to the time of the making of the treaty.

*necessary to prevent the exercise of that right in a manner that would imperil the continued existence of the fishery.*

To prevent any misunderstanding which may arise from the immediately preceding statement, it should be stressed that this language is not intended to imply or advocate use of the so-called "indispensible" test for measuring the validity of a state fishery regulation. This court has previously held that:

> a requirement that a state regulation must be "indispensible" to the conservation of the fishery before it can be enforced against treaty Indians is neither good law nor presently binding upon the State of Washington.

*State v. Moses,* 70 Wn.2d 282, 288, 422 P.2d 775 (1967). Any question as to the proper test for determining the permissible extent of a state regulation in such circumstances, was resolved in *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 398, 399, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968):[8]

> the right to fish at those respective places is not an exclusive one. Rather, it is one "in common with all citizens of the Territory." Certainly the right of the latter may be regulated. . . . [T]he manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians.
>
> . . .
>
> In other words, the "right" to fish outside the reservation was a treaty "right" that could not be qualified or conditioned by the State. But "the time and manner of fishing . . . necessary for the conservation of fish," not being defined or established by the treaty, were within the reach of state power.

The *Puyallup* case concluded with the following statement:

> *Since the state court has given us no authoritative answer to the question [whether the prohibition was reasonable and necessary for conservation], we leave it unanswered and only add that any ultimate findings on the*

---

[8]Reported below as *Department of Game v. Puyallup Tribe, Inc.,* 70 Wn.2d 245, 422 P.2d 754 (1967). *See* Note, *Regulation of Treaty Indian Fishing,* 43 Wash. L. Rev. 670 (1968).

*conservation issue must also cover the issue of equal protection implicit in the phrase "in common with."*

(Italics mine.) *Puyallup Tribe v. Department of Game, supra,* at 403.

Thus, it is clear that the state may sustain its fishery regulations against treaty beneficiaries' attack when it can show that its regulations are reasonable and necessary to conserve the fishery:

> *The burden of proof,* once the defendant has established that he is a member of a tribe having a treaty right to take fish at all "usual and accustomed grounds and stations," *is on the state to show that its regulations, which limit Indian fishing rights either as to the time or manner of fishing, are reasonable and necessary to conserve the fishery.*

(Italics mine.) *Department of Game v. Puyallup Tribe, Inc.,* 70 Wn.2d 245, 257, 422 P.2d 754 (1967).

*The question which remained unanswered in the Puyallup case, and which remains unanswered in the majority's disposition of the instant case is: by what means must the state prove the reasonable necessity of the fishing regulation in question?*

The resolution of this question is, in my opinion, the fundamental issue presented in the instant appeal. The question may best be answered by delineating an analytical approach rather than by pronouncing an unwavering "black letter" formula. In cases challenging state conservation regulations as allegedly conflicting with Indian treaty rights, I believe the crucial and requisite judicial function should embrace a 2-step analysis: (1) once the court has determined the quantum or nature of rights originally granted or reserved by such treaty, it must then (2) determine that the state regulation in question fully recognizes and preserves those originally granted or reserved rights *in proportionate quantum* among entitled users.

In the instant case, I do not believe that the state has, by sufficient proof, demonstrated that the rights granted or reserved to the Indian beneficiaries of the Treaty of Point

Elliott are fully recognized and preserved in *proportionate quantum* by the regulation in question—RCW 77.16.060. Neither do I believe, for the reasons stated below, that the instant record contains sufficient facts by which this court can measure the reasonable necessity of the statute in light of the treaty fishing rights involved herein.

In determining whether a state regulation affecting the right of Indians to take fish at their usual and accustomed fishing places is demonstrated to be reasonable and necessary for purposes of conservation, I would require the state to comply with the following standard:

> [*the state*] *must so regulate the taking of fish that the treaty tribes and their members will be accorded an opportunity to take, at their usual and accustomed fishing places, by reasonable means feasible to them, a fair and equitable share of all fish which* [*the state*] *permits to be taken from any given run.*

(Italics mine.) *Sohappy v. Smith*, 302 F. Supp. at 907. In short, the state, in regulating its fishery resources, must demonstrate that such regulations produce an *equitable allocation* as among entitled users giving full recognition to the rights of treaty Indians.[9] Conversely, the equitable allo-

---

[9]The complex nature of fisheries management is such that no single judicial pronouncement can prescribe in advance all details of an appropriate regulation. The determination that a given fisheries regulation is reasonable and necessary, as measured against the fishing rights of treaty Indians, must depend upon a case-by-case, and equally importantly, a river-by-river, analysis of each questioned regulation. *It is possible, however, to illustrate the central thrust of the above-stated criteria.* These criteria may be related to the particular resource involved herein—the Green River steelhead fishery. Existing state regulations prescribe catch limits on the number and size of steelhead which may be taken per person on a daily, summer weekly and annual basis. Additionally, seasonal limits are imposed. The effect of these regulations is to insure adequate conservation of the run through escapement; *i.e.*, that the steelhead will not be overfished and thereby depleted.

We may assume, for purposes of illustration, that the total annual run of steelhead on the Green River is 100. The effect of the aforementioned regulations will be to insure that, for example, 50 steelhead will escape capture and spawn. The critical question posed in light of the above-stated criteria is, *Of the remaining 50 steelhead in the run,*

cation of any run must give proper recognition to fishery propagation by state efforts. Where, through state efforts and expenditure of state funds a given run has been (1) materially enhanced over its probable natural quantum; or (2) entirely created where no such run previously existed, rights granted by Indian treaties must be measured against the run in its natural, rather than in its enhanced, condition. Thus, of necessity, the reasonableness of any given regulation must depend upon a river-by-river study and evaluation.[10]

The fundamental necessity and equitable correctness of the above-outlined criteria may be demonstrated by an analysis of conservation policies of this state. The *Sohappy* court, in describing conservation policies employed by the

---

*eligible for take, how many are presently caught by treaty Indians and how many are presently caught by non-treaty sportsfishermen?*

Because the present controversy centers upon preservation of a steelhead fishery, the competing "takers" include only two groups: treaty Indians fishing at usual and accustomed grounds and stations, *and* non-Indian sportsfishermen. Since the steelhead is a game fish and is not generally subject to commercial trafficking (see note 7 *supra*), its conservation centers primarily—but by no means exclusively—upon the insuring of adequate run escapement. If our analysis is widened to include the salmon fishery, a third competing taker—the commercial fisherman—is added. To posit an extreme (but apparently not unlikely) example, assume that the state allows Strait of Juan de Fuca and Puget Sound commercial fishermen to take 99 per cent of a given salmon run prior to its arrival at usual and accustomed treaty Indian grounds and stations. Of necessity, drastic catch limitations would be imposed on river and stream fishermen. Such restrictions would, most assuredly, be *necessary*, but they would, *de facto*, be unreasonable as applied to treaty Indian fishermen.

[10]Two cogent examples may be presented to illustrate this point. Prior to 1945, several falls in the Deschutes River constituted a natural barrier totally thwarting the efforts of salmon to spawn. Through construction of a fish ladder bypassing the falls and scientific planting and propagation methods, the state literally "created" a run where none had previously existed. After some 25 years, the Deschutes now serves as a spawning ground for fall chinook, coho and steelhead.

The Puyallup River serves to illustrate *run enhancement* through state efforts. There, the state department of game has, by hatchery plants, increased the normal run of 5,000 steelhead per year to 12,000 to 18,000 per year. Both examples emphasize the need for a river-by-river analysis of any state regulation in determining its reasonableness as applied to treaty Indians.

state of Oregon—which closely parallel the policies of our own state—noted:

> Oregon's conservation policies are concerned with allocation and use of the state's fish resource as well as with their perpetuation. *It has divided the regulatory and promotional control between two agencies—one concerned with the protection and promotion of fisheries for sportsmen . . . and the other concerned with protection and promotion of commercial fisheries. . . . The regulations of these agencies, as well as their extensive propagation efforts, are designed not just to preserve the fish but to perpetuate and enhance the supply for their respective user interests.*

(Italics mine.) *Sohappy v. Smith, supra* at 909. I am convinced in the instant case that the state has presented no evidence to indicate its consideration of the treaty rights of appellants *as an interest to be recognized or a fishery to be promoted in the state's regulatory and developmental program.* By this statement, I do *not* mean to ascribe any bad faith to the state's past or present regulatory actions or policies. Rather, I mean only to imply that such proof was not presented at the trial of the instant case. Absent such proof, I do not believe this court can or should determine whether the questioned state regulation is reasonable and necessary for conservation of the Green River steelhead fishery.

My concern herein is well-summarized by Belloni, J., in the *Sohappy* opinion:

> In determining what is an "appropriate" regulation one must consider the interests to be protected or objective to be served. In the case of regulations affecting Indian treaty fishing rights the protection of the treaty right to take fish at the Indians' usual and accustomed places *must be an objective of the state's regulatory policy coequal with the conservation of fish runs for other users.* The restrictions on the exercise of the treaty right must be expressed with such particularity that the Indian can know in advance of his actions precisely the extent of the restriction which the state has found to be necessary for conservation.

(Italics mine.) *Sohappy v. Smith, supra* at 911. In the

instant case, the state produced a large quantity of evidence in support of its contention that the total prohibition of gill net fishing was reasonable and necessary to conserve the steelhead fishery in the Green River. Upon careful review of this evidence, I am convinced that it demonstrates only the necessity of totally prohibiting the use of gill nets to produce optimal preservation of the steelhead *for purposes of sports fishing*. I am not persuaded that this evidence shows any consideration by the state of the special rights held by treaty Indians.

Testimony of the state's fishery experts at trial is presented fairly and at length in the majority opinion. It will not be restated here, except as is necessary to indicate those respects in which it seems to me that testimony falls short of the proof which should be required upon rehearing. The testimony of Dr. Lauren R. Donaldson, Professor of Fisheries at the University of Washington, indicated his belief that the total prohibition against gill net fishing was reasonably necessary for conservation. He defined "conservation" in the following manner: "Well, I think conservation means the maximum sustained yield, commensurate with maintaining the run at the optimum level." Dr. Donaldson's testimony is, I believe, ambiguous on the critical issue of whether "optimum" conservation as now practiced by the state fairly includes and protects the rights of treaty Indians. Dr. Donaldson did, in fact, admit that there could be a regulated gill net fishery.

The state's expert witnesses from the departments of fisheries and game testified more emphatically. Clifford Millenbach, chief of the fisheries management division of the state department of game, testified that prohibition of gill net fishing was reasonably necessary *because* the nets prevent adequate escapement for spawning. His data, however, was based on Puyallup River experiences. In fact, the appropriate state regulatory agency has apparently *made no study of gill net fishing as it might specifically affect the Green River steelhead run.*

J. E. Lasater, assistant director of operations for the state

department of fisheries, testified that gill net fishing, if allowed, would "reduce the stock of both wild and hatchery fish, and also reduce our ability to use the hatchery to its full production potential." He further testified that partial closures for intervals were ineffective. However, there is no indication of the possible effectiveness of *less restrictive regulations* short of total prohibition—*e.g.*, restriction of non-Indian gill netting or catch restrictions based on numeric or poundage limitations.

In determining whether the instant regulation (RCW 77.16.060) is reasonable and necessary for conservation of the fishery in view of the rights possessed by treaty Indians, several facts would be of extreme relevance on remand: (1) what is the present and projected run of Green River steelhead?; (2) what percentage of the run will be taken by all fishermen, and what percentage will be allowed to escape and spawn?; (3) what is the minimum required escapement to insure preservation of the fishery?; (4) of the steelhead now permitted to be taken from the annual Green River run, what percentage is taken by treaty Indians, and what percentage is taken by non-Indian sportsfishermen? This list is not exhaustive. Other relevant facts can certainly be developed by our competent state fisheries experts.[11]

These questions are not answered by the instant record. I would, therefore, remand this case for further determination of the reasonable necessity of RCW 77.16.060, as applied to Indian treaty beneficiaries, in light of the standards described above. Specifically, on remand I would require the state to prove: (1) that the regulation insures treaty Indian beneficiaries the right to take a fair and equitable

---

[11]Additional data of some relevance might include the number of steelhead trapped by commercial fishermen in the Strait of Juan de Fuca and Puget Sound utilizing both gill net and trawling equipment. Although the steelhead, as a game fish, is not subject to commercial trafficking (*see* note 7 *supra*), it is highly probable that a number of these fish are incidentally captured annually by commercial fishermen, and are subsequently "mixed" with the commercial salmon catch *or* are released in an irreparably injured condition.

share of all steelhead which the state now permits to be taken from any given Green River run; and (2) that the regulation is demonstrably reasonable and necessary based upon actual run and catch data relating to the Green River.

The above-enumerated factual questions are best resolved by professional fisheries experts. I have the highest respect for, and confidence in, this state's appropriate regulatory personnel to provide fair and adequate answers to these inquiries. It is proper for this court to recognize the appropriate limitations on its authority and abilities in this complex legal area, requiring the guidance of technological as well as social expertise:

> This court cannot prescribe in advance all of the details of appropriate and permissible regulation of the Indian fishery, . . . "[P]roper anadromous fishery management in a changing environment" is not susceptible of rigid predetermination. . . ." The requirements of fishery regulation are such that many of the specific restrictions, particularly as to timing and length of seasons, cannot be made until the fish are actually passing through the fishing areas or shortly before such time.

*Sohappy v. Smith, supra* at 911. Although not of record herein, there is some indication that the state is keenly interested in, and is resolved to be guided by, the "wording and spirit" of the *Sohappy* opinion. *See* Uncommon Controversy, *supra,* at 200. Thus, it would appear that the remand of this case for further proof as indicated offers both an equitable and reasonable solution to the complex issues presented herein.

For the purposes of clarity on remand, I would resolve, in the instant opinion, several questions left unanswered by the majority's resolution of this case. These questions involve (a) whether the Muckleshoot Indians were signatories of the Treaty of Point Elliott; (b) whether a treaty existed at the time of appellants' arrest herein; and (c) whether the appellants herein are beneficiaries under that treaty. I would sustain the trial court's finding that the Muckleshoot Tribe was a party to the treaty and that the

appellants herein were members of that tribe. That finding is supported by substantial evidence.

For the reasons stated, I would remand the instant case for further determination of the issues indicated.

NEILL and STAFFORD, JJ., concur with FINLEY, J.

STAFFORD, J. (concurring in dissent)—Justice Finley has referred to the majority's failure to come to grips with the fundamental problem of delineating the point at which federally protected Indian fishing rights end and the power of the state to regulate those rights begins under article 5 of the Treaty of Point Elliott.[12] That shortcoming is not limited to this case, however. It is to be found in most cases that have dealt with this extremely vexing question.

Unfortunately, we have been too prone to interpret article 5 in terms of the practicalities of today's depleted fishery. As a result, we have overlooked the historical background of an agreement reached jointly by the Indians and the federal government in 1855. We have attempted to ascertain the meaning of a treaty executed in 1855 by reference to the exigencies of today rather than by consideration of the circumstances that actually surrounded the contracting parties in 1855. As a result we have approached the task of interpretation from the wrong end.

The meaning attached to the treaty by the contracting parties must be ascertained by the facts and circumstances that surrounded them at the time the treaty was negotiated. *Winters v. United States,* 207 U.S. 564, 52 L. Ed. 340, 28 S. Ct. 207 (1908). This includes such matters as the original needs and wants of the Indians, *Winters v. United States, supra; Conrad Inv. Co. v. United States,* 161 F. 829 (1908); and how they satisfied those needs and wants im-

---

[12]Insofar as relevant, article 5 of the Treaty of Point Elliott provides:

The right of taking fish at usual and accustomed grounds and stations is *further secured* to said Indians *in common with all citizens of the Territory,* and of erecting temporary houses for the purpose of curing, together with the privilege of hunting and gathering roots and berries on open and unclaimed lands.

(Italics mine.) 12 Stat. 927 (1863).

mediately before and after the treaty, *State v. Edwards,* 188 Wash. 467, 62 P.2d 1094 (1936). As so aptly stated in *Tulee v. Washington,* 315 U.S. 681, 684, 86 L. Ed. 2d 1115, 62 S. Ct. 862 (1942):

> It is our responsibility to see that the *terms of the treaty* are carried out, so far as possible, *in accordance with the meaning they were understood to have by the tribal representatives at the council,* and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people.

(Italics mine.)

To say merely that the Indians were a "fish eating" people conveys an incorrect impression. It is clear that they caught fish in order to *exist.* Not only was fish the mainstay of their diet in the spring and summer, it was dried and stored for winter as well.[13]

It is illogical to assume the Indians would have agreed voluntarily or knowingly to reduce the area of their occupancy and also to give up the very fish that would make the contemplated reservations livable or adequate. *Winters v. United States, supra; United States v. Ahtanum Irr. Dist.,* 236 F.2d 321 (1956).

It is not necessary, however, to speculate upon the Indians' need to fish or to guess about the federal government's intention that they have the right to meet that need. One need only refer to the minutes of the Treaty Council, January 22, 1855.[14]

In considering the minutes it must be remembered that Governor Stevens spoke to an assemblage of Indians who understood no English, thus, it was necessary to rely upon interpreters. The Indians were neither masters of a written language nor skilled in matters of diplomacy. Governor

---

[13]Article 5 of the treaty supports this view by providing for the right of "erecting temporary houses for the purpose of curing [fish is the only subject under consideration at that point in the treaty], together with the privilege of hunting and gathering roots and berries on open and unclaimed lands."

[14]These minutes are preserved and are available at the National Archives.

Stevens' audience was composed of uncivilized[15] men and women whose very existence depended upon fish both to eat and to sell to the settlers. How would they have interpreted the glowing words that follow:

My children, you are not my children because you are the fruit of my loins but because you are children for whom I have the same feeling for from [*sic.* probably means "as if"] little children the fruit of my loins. You are my children because I will labor for you persistently for all of my life. What will a man do for his children. A man for his own children will see that they are well cared for. He will see that they have clothes to guard them from the wintry season. He will see that they have food to guard them against being hungry. And as for thirst you have your own glorious brooks. *But as for food you yourselves now, as in times past, can take care of yourselves.*

*I have called you my children and as my children I have spoken to you of the food that could save you from hunger and your flowing brooks that could save you from thirst but I give to my own children food and drink and sometimes more. I want that you shall not have simply food and drink now but that you may have them forever* . . .

. . .

*You understand well my purpose,* now you want to know what we desire to do for you. *We want to give you houses and having homes you will have the means and the opportunity* to cultivate the soil to get your potatoes and *to go over these waters in your canoes to get fish. We want more. If you desire to go back to the mountains and get your roots and your berries you can do so and you shall have homes and shall have these rights, the Great Father desiring them.*

. . .

The Great Father wants you to have a school where you can learn agriculture and to be artisans and to get two blankets when you have one now and learn to take

---

[15]The word "uncivilized" does not mean that they lacked a culture. In comparison, however, it was a culture totally unprepared to cope with the matters being resolved and the method of resolution. They were in an unequal negotiating position from the standpoint of diplomacy. *State v. Edwards,* 188 Wash. 467, 62 P.2d 1094 (1936).

care of yourself as white people the Great Father wants this in fact. He wants you to have a place where your children can learn to read and write, learn to be farmers and mechanics and *also wants you to take your fish and go back to the mountains and get berries. Is this good, don't you want this?*

(Italics mine.)

As can be seen, Governor Stevens made it abundantly clear that the Indians could fish as they had since the time of their forefathers. His overpowering explanation of the treaty contained no mention of restricting those rights. The speech omitted any reference to "taking fish at usual and accustomed grounds and stations" or fishing "in common with all citizens of the Territory." These expressions, which have caused so much bitter litigation, first appeared in the *written* treaty.

It is true the Governor mentioned the two ideas during negotiations with other tribes near Walla Walla, *State v. Tulee*, 7 Wn.2d 124, 146, 109 P.2d 280 (1941). But, those negotiations involved different treaties and different tribes, far removed from those with which we are here concerned.

The minutes of the Walla Walla Conference of May 29, 1855[16] do, nevertheless, cast light on the problem at hand. Governor Stevens told those Indians of the Treaty of Point Elliott and discussed the fundamental needs of the Puget Sound Indians as follows:

I have made treaties with all the Indians on that Sound. They number more than all the tribes present. They have all agreed . . . to go on one reservation. That reservation is only about one-fiftieth part as large as this; *they have however, few horses and cattle. They have not three hundred head. They take salmon and catch whale and make oil. They ask for no more land. They think they have land enough. You will be farmers and stock raisers and wool growers and you need more.*

(Italics mine.)

It is evident that the Governor did not seriously consider that the Puget Sound Indians were to be farmers and stock

---

[16]These minutes are preserved and available at the National Archives.

raisers. They had been and were to be fishermen. It is obvious that these Indians estimated their situation similarly in light of the reservations they were willing to accept. They were well suited to the kind of life they had lived and the manner in which they had always supported themselves, as long as they retained the right to fish in the manner implied by Governor Stevens in his impressive speech.

The Governor's statements were made at a time when the northwest was a wilderness. They were made at a time when Indians and white men alike hunted and fished as they desired without let or hindrance from the federal or territorial governments. The regulation of fish and game was neither known nor dreamed of. The Indians had fished in the area since time immemorial. The catching of fish was necessary for the sustenance of themselves and their families. Neither the Governor nor the Indian chiefs could possibly have visualized present day restrictions. They entered into the treaty under conditions as they existed at that time. Thus, we must interpret the treaty and the rights of the Indians in light of what they then knew about need for regulation, keeping in mind that both parties planned that the needs and abilities of the Indians would obviously grow in the future.[17]

---

[17] (A.) *Minutes of the Treaty Council,* January 22, 1855, Treaty of Point Elliott.

"The Great Father wants you to have a school where you can learn agriculture and to be artisans and to get two blankets when you have one now and learn to take care of yourself as white people the Great Father wants this in fact. He wants you to have a place where your children can learn to read and write, learn to be farmers and mechanics and *also wants you to take your fish and go back to the mountains and get berries. Is this good, don't you want this?"* (Italics mine.)

(B.) The Treaty of Point Elliott, 12 Stat. 927 (1863).

"Article XIV. The United States further agree to establish at the general agency for the district of Puget's Sound, within one year from the ratification hereof, and to support for a period of twenty years, an agricultural and industrial school, to be free to children of the said tribes and bands in common with those of the other tribes of said district, and to provide the said school with a suitable instructor or instructors, and also to provide a smithy and carpenter's shop, and furnish them with the necessary tools, and employ a blacksmith, car-

If the Governor and the federal government were sincere in their negotiations and if the promises were made in good faith, as I am sure they were, then all of the facts connected with the making of the treaty should be considered in arriving at the intent of the parties. This would of necessity include Governor Stevens' explanation made to a people who had no written language and whose only knowledge of the terms of the treaty was that imparted to them by the Governor and the interpreter employed by the United States. As we said in *State v. Edwards*, 188 Wash. at 471, quoting from *Jones v. Meehan*, 175 U.S. 1, 44 L. Ed. 49, 20 S. Ct. 1 (1899):

> "In construing any treaty between the United States and an Indian tribe, it must always . . . be borne in mind that the negotiations for the treaty are conducted, on the part of the United States, an enlightened and powerful nation, by representatives skilled in diplomacy, masters of a written language, understanding the modes and forms of creating the various technical estates known to their law, and assisted by an interpreter employed by themselves; that the treaty is drawn up by them and in their own language; that the Indians, on the other hand, are a weak and dependent people, who have no written language and are wholly unfamiliar with all the forms of legal expression, and whose only knowledge of the terms in which the treaty is framed is that imparted to them by the interpreter employed by the United States; and that the treaty must therefore be construed, not according to the technical meaning of its words to learned lawyers, but in the sense in which they would naturally be understood by the Indians.

In retrospect, it seems almost irony that Governor Stevens had been instructed to negotiate a treaty that would,

---

penter, and farmer for the like term of twenty years to instruct the Indians in their respective occupations. And the United States finally agree to employ a physician to reside at the said central agency, who shall furnish medicine and advice to their sick, and shall vaccinate them; the expenses of said school, shops, persons employed, and medical attendance to be defrayed by the United States, and not deducted from the annuities."

insofar as possible, avoid misunderstandings in the future. Unfortunately, the result was far wide of that idealistic mark.

Regrettably, article 5 has caused the very misunderstanding it was intended to avoid. The economic and socio-legal interests of competing users of the depleted fishery have faced an ever-widening gulf.

Justice Finley has suggested one possible means of threading our way through the quagmire that has evolved from an assertion of competing rights on an "all or nothing" basis. He suggests that both the state of Washington and the Indians have rights that must be recognized. The Indians, however, have federally protected treaty rights that must receive definitive consideration in the exercise of any state regulatory measure. He suggests further that problems peculiar to each river require that the matter be resolved on a river-by-river basis.

There is another approach to this vexing problem. Usually federal treaties are handled on a federal level. This federal treaty should be dealt with similarly to insure uniform interpretation and application.

Although Congress has refrained from doing so in this instance, it has the power to abrogate or change treaty rights by passing a clear and express act which is of such a nature that the treaty and the act cannot in any reasonable view stand together. *Stephens v. Cherokee Nation,* 174 U.S. 445, 43 L. Ed. 1041, 19 S. Ct. 722 (1899); *Seneca Nation of Indians v. Brucker,* 262 F.2d 27 (1958); *Nicodemus v. Washington Water Power Co.,* 264 F.2d 614 (1959); *United States v. 5,677.94 Acres of Land, More or Less, of Crow Reservation,* 162 F. Supp. 108 (1958). Thus, Congress has the power to regulate Indian fishing rights.

*Seneca Nation of Indians v. Brucker, supra; Nicodemus v. Washington Water Power Co., supra;* and *United States v. 5,677.94 Acres of Land, More or Less, of Crow Reservation, supra,* all involve the federal government's use of eminent domain to acquire Indian property rights. In each

case, the Indians involved were paid just compensation for the right taken or invaded.

It is suggested that the federal government has the power to acquire the Indians' treaty fishing rights by eminent domain. To do so, however, the *federal government would be required to pay just compensation* to those tribes having such federally protected fishing rights.

This procedure would eliminate the problem for all competing interests. All would be placed on an equal footing, subject to the same regulations. The festering sore of misunderstanding would be removed.